1               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3   * * * * * * * * * * * * * *
    UNITED STATES OF AMERICA     *
4                                *   CRIMINAL ACTION
              v.                 *   No. 21-10200-RGS
5                                *
    ABHIJIT DAS,                 *
6   a/k/a Beej Das               *
                                 *
7   * * * * * * * * * * * * * *

8

9        BEFORE THE HONORABLE RICHARD G. STEARNS
         UNITED STATES DISTRICT JUDGE and a JURY
10                   JURY TRIAL DAY 1
                    October 2, 2023
11

12  APPEARANCES:

13        UNITED STATES ATTORNEY'S OFFICE, (By AUSA Neil J.
    Gallagher, Jr., and AUSA Elysa Q. Wan) 1 Courthouse Way,
14  Suite 9200, Boston, Massachusetts, 02210, on behalf of
    the United States of America
15

16        WHITE & CASE, LLP, (By Michael Kendall, Esq., and
    Abigail Mahoney, Esq.) 75 State Street, Boston,
17  Massachusetts, 02109-1814, on behalf of the Defendant

18

19
                              Courtroom No. 21
20                            1 Courthouse Way
                              Boston, Massachusetts 02210
21

22

23            James P. Gibbons, RPR, RMR
                 Official Court Reporter
24          1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210
25               jamesgibbonsrpr@gmail.com

```
1                    P R O C E E D I N G S

2            THE CLERK:  All rise for the jury.

3        (Whereupon, the jury entered the courtroom.)

4        (Whereupon, the Court entered the courtroom.)

5            THE CLERK:  Court is open.  You may be seated.

6            THE COURT:  Congratulations again, Jurors.

7        As promised, I have a few words by way of orientation

8    for you before we begin the formal trial proceedings.

9        It is your duty as the jury to find the facts of the

10   case from the evidence that will be presented during the

11   trial.  You, and you alone as the jurors, are the judges of

12   the facts.

13       You will then have to apply to the facts you find the

14   law as I will explain it to you.  You must follow the law as

15   I explain it whether you personally agree with the wisdom of

16   the law or not.

17       The evidence from which you will find the facts will

18   consist of principally the testimony of witnesses, but also

19   documents and other things admitted as exhibits, and any

20   facts over the course of the trial that the lawyers agree to

21   or, as they would say, "stipulate" to.

22       Certain things are not evidence and should not be

23   considered in reaching your verdict.  Statements, arguments,

24   and questions by lawyers are not evidence.  They'll be

25   helpful in setting the context for evidence, but they
```

1    themselves are not to be taken as points of evidence.

2        Similarly, objections to questions are not evidence.

3    Lawyers have a duty to their clients to object when they

4    believe that evidence being offered is improper under the

5    rules of evidence.  You should not be influenced by an

6    objection or by any assertion of fact a question objected to

7    might otherwise have contained.  If I overrule an objection,

8    treat the witness' answer as you would any other.

9        If I permit the question; that is, if I overrule the

10    objection, again, treat the witness's answer as you would

11    any other.

12        Testimony that I exclude or instruct you to disregard

13    is not evidence and must not be considered by you in

14    reaching your verdict.

15        If I instruct you that an item of evidence is received

16    for a limited purpose, you may only consider that evidence

17    for the purpose I define for you.

18        Anything that you may see or hear outside the courtroom

19    is not evidence, and must be disregarded.  You must decide

20    the case based solely only on the evidence presented here in

21    open court.

22        Now, there are two kinds of evidence in a trial.  There

23    is "direct" evidence and then there is so-called

24    "circumstantial" evidence.  That's a term that I know you

25    have all heard but may not have a ready definition for.

1      Direct evidence is direct proof of a fact, usually

2  presented through the testimony of a person who claims to

3  have been an eyewitness to an event or a participant in a

4  conversation.

5      When you evaluate direct evidence, your task is fairly

6  straightforward:  Do you believe that what the witness is

7  telling you is true?

8      When you look at circumstantial evidence, the task is

9  somewhat different.  Circumstantial evidence is the proof of

10 a chain of circumstances or set of facts from which you

11 could infer or conclude that another fact is true even

12 though you have no direct evidence of that fact.

13     To give a simple example, assume when Tim, the court

14 clerk, arrived here this morning, he did not find me in my

15 office, but he found my coat hanging in the closet, the work

16 I had taken home over the weekend spread out on my desk,

17 with a copy of this morning's newspaper and a cup of

18 steaming coffee.

19     From these facts he could properly infer or conclude

20 that even though he hadn't seen me I had already arrived for

21 work and was simply somewhere else in the courthouse.

22     Despite what courtroom television drama likes to teach,

23 the law draws no distinction between these two types of

24 evidence.  It doesn't consider one superior or inferior to

25 the evidence.  You may consider both direct and

1    circumstantial evidence in reaching your verdict, and you

2    may give that evidence whatever weight you, as the jury,

3    decide it deserves.

4        Now, in speaking with jurors after trials, I've learned

5    to answer several questions right at the beginning.

6        "Will we have transcripts of witness testimony

7    available for use during our deliberation?"

8        The answer is no.  Not because we wouldn't make it

9    available to you if we had it.  Mr. Gibbons is keeping a

10   record of the trial, which will become a permanent record of

11   everything that is said during the trial, but he's doing it

12   in shorthand, which, if you weren't trained as a court

13   reporter, you couldn't read.  So it's going to be some weeks

14   before we actually have the transcripts.

15       "Well, if we won't have witness transcripts, can we

16   take notes?"

17       Well, a good example of circumstantial evidence.  I

18   think Tim gave you all a notebook and a pen, so of course

19   you can.

20       You do not have to take notes if you do not want to.

21   The one thing I can promise you is that no one will ever

22   look at the notes you keep unless you decide to share them

23   with other jurors during deliberations.

24       At the conclusion of the trial, either take the

25   notebook with you or, if you don't, Tim will shred it, and

1    any contents will be shred.

2        I mention this phenomenon of "sidebars," where judges

3    huddle with the lawyers at the side of the bench.  I do not

4    permit them.  Your time is too valuable.  There's no reason

5    that we can't do all of our business here in open court, and

6    that's the way I prefer it.  So there's not going to be the

7    distractions of sidebar conferences except twice during the

8    case where I am required by law to meet with the attorneys.

9    But I try to schedule those two events when you're on a

10   break or before or after the trial, so again there's no

11   disruption in the flow of the trial itself.

12       Judging the credibility of the witness, I think, is the

13   most important task that you have.  It is up to you to

14   decide which witnesses to believe, which witnesses not to

15   believe, and how much of any witness' testimony to accept or

16   reject.

17       In performing this task, there's certain tests that you

18   will apply, which are pretty commonsensical:  The confidence

19   that the witness shows on the witness stand; his or her

20   seeming intelligence; whether the witness was contradicted

21   by anything that he or she said before the trial; whether

22   the witness appears to have a motive or bias for testifying

23   in a certain way; and whether his or her testimony seems

24   probable or improbable in light of all the other facts in

25   the case.

1          You may also consider the fact that someone may quite

2     sincerely believe that something happened, or that they saw

3     something, and just simply be mistaken as to what the truth

4     actually was.

5          Because this is a criminal case, I explained the three

6     rules that you must always keep in mind.  The first is that

7     the defendant is presumed innocent, and again that

8     presumption lasts unless and until the government succeeds

9     in proving his guilt beyond a reasonable doubt.

10         That burden, the burden of proof, is on the government

11    throughout the trial.  As I explained, the defendant has no

12    burden in a criminal trial to prove anything.

13         And, third, the government must prove the defendant's

14    guilt beyond a reasonable doubt.  That is a much higher

15    standard than the "preponderance of the evidence" or the

16    "more likely than not" standard that we apply in civil

17    cases.

18         Again, at the conclusion of the trial, I will give you

19    the best definition I can of what we mean by "proof beyond a

20    reasonable doubt."  But, as I said, I think most of us have

21    a pretty good intuitive understanding of what the burden is.

22         The way the case proceeds is, first, by way of opening

23    statements.  Each side is permitted to give an opening

24    statement by way of a forecast or preview of the evidence

25    that they believe will be offered during the case that is

1    supported of their position with respect to the Indictment.

2         These opening statements are not intended to be

3    arguments.  They're intended to be helpful to you, but the

4    arguments you'll get to hear at the end of the case when the

5    lawyers are free then to argue directly the inferences that

6    they believe are supported by the evidence that is actually

7    received during the trial.

8         Following these statements, we will begin with the

9    witnesses in the case.  We will hear the witnesses until

10   each side has reached the end of their case, and at that

11   point I will give you the instructions on the law.  And my

12   practice is to write out the instructions verbatim

13   beforehand, so each of you will have a copy of the

14   instructions which will both make it easier to follow along

15   as I give them but also to consult in the jury room.  So you

16   can be confident that those will be with you in your

17   deliberations.

18        Just a few words about your conduct as jurors.

19        First, I instruct you that you are not to discuss the

20   case with each other or anyone else until we get to the

21   deliberations at the end of the case.  Now, don't make -- I

22   don't want that to sound impossible.  I know that you will

23   be talking about the trial, since things will happen, and as

24   normal human beings we're going to be conversing about what

25   we see and what experience we're having.

1          But what we mean by this instruction is don't offer any

2      opinion about anything conclusive in the case until you have

3      heard all the evidence and have had a chance to hear what

4      your fellow jurors think.

5          Until that point, keep an open mind and try to keep

6      your opinions, as you develop opinions as the case goes on,

7      but try to keep those for the deliberations.

8          Do not read or listen to anything that may be reported

9      in the media about the case during the course of the trial.

10     If you do encounter a newspaper or radio or television

11     account of the trial, just turn away.  At the end of the

12     case, we'll have time to go back and look if we think that

13     you missed anything.  But the fact is you're going to know a

14     lot more about the case than any reporter trying to tell a

15     story to the public.

16         Third, I ask, and this is important in this day and

17     age, please do not do any independent research of your own

18     about the facts of the case.  In this age of Google, it's

19     always very tempting to go and try to do your own

20     independent research about the facts of things.  I ask that

21     you don't do that because we all have to decide the case

22     based on what we all hear collectively here in the

23     courtroom.

24         We do some things that -- we try to make jury service

25     as easy as we can for you.

1        Each morning, as today, we'll take a 25-minute break,

2   usually around a quarter of eleven.  We will have

3   refreshments for you then.  Today we have lunch for you at

4   12:45.

5        I know how difficult commuting is now in Boston, as I

6   have to confront it every day as well.  Public

7   transportation is not as reliable as it used to be.  The

8   highways are pretty congested.  So to make life easier, we

9   will put out a light breakfast for you at eight o'clock each

10  morning so don't have to stop or worry about getting

11  something to eat on your way into the courtroom.  We will

12  have that here for you.

13       If you wish to, you're welcome to bring in a bottle of

14  water -- we'll make them available upstairs -- into the jury

15  box.  But that's the only liquid permitted in the courtroom.

16  Not my rule.  It's the General Services Administration.

17  They actually run the building, and they're very jealous of

18  their carpets, so water is the only thing that they permit

19  in the courtroom itself.

20       I do know over the next week or two you will get a

21  chance to look at this building.  It is a magnificent

22  courthouse.  I served for a number of years on what was

23  called the Space and Facilities Committee, which was the

24  committee that oversees all courthouse construction and

25  renovation nationally.  So I have seen lots of courthouses.

1    And I'm not embarrassed to say -- in fact, I'm rather proud

2    of the fact -- that this is, I think, the most beautiful and

3    functional of the modern courthouses in the federal system.

4        It was opened in 1998 and dedicated in the memory of

5    Congressman Joseph Moakley, who was the driving force -- he

6    and Mayor Menino were the real driving force behind locating

7    the courthouse here in what used to be an empty lot.  There

8    was almost nothing in this area.  It's now hard to believe

9    what has happened in the last 20 years with the development

10   of the Seaport District.

11       Before this -- obviously this was not our first

12   courthouse.  In fact, this court is one of the oldest --

13   it's either the third or possibly the second -- but at least

14   the third oldest court in the federal system.  It dates back

15   to 1789, the very beginning of the constitutional period of

16   the U.S. Government.

17       The first courthouse was actually not a courthouse.  It

18   was actually located in a tavern called the "Bunch of

19   Grapes," which was, I think as best I can tell, it's long

20   gone, is where essentially Congress and State Street

21   intersect in Boston itself.

22       Judge Lowell was the first judge.  For a century there

23   was only one judge in this court appointed federally.  He

24   thought that was somewhat undignified, for evident reasons,

25   and moved the courthouse to Salem, Massachusetts.

1          Why Salem?

2          Well, Salem at the time was the richest seaport in the

3     world because almost everything imported into the United

4     States from Europe or Asia came through Salem, Salem being a

5     day closer to Europe than New York or Boston.  Not the

6     greatest harbor, but in terms of proximity it was the most

7     convenient harbor to use.

8          The court sat there.  Judge Lowell actually left after

9     a year after moving the courthouse to Salem and was

10    succeeded by Judge Dodge, and then for the next century we

11    go back and forth between Lowells and Dodges basically

12    heading the court, but again one judge sitting.

13         Judge Dodge left Salem in the beginning of the War of

14    1812 because he had been threatened with being kidnapped by

15    the British and thought it was unsafe, so he came back to

16    Boston temporarily, and the Boston courthouse, such as it

17    was in those days, remained the locus of the court.

18         Why did they not go back to Salem?  The very simple

19    answer was the Erie Canal.  The Erie Canal began

20    construction in 1815.  Once the Canal was opened, it was

21    easier to ship goods to New York, and then you had canal

22    service all the way to the Great Lakes.

23         So Salem basically had its day.

24         Nathaniel Hawthorne was still up there in the 1840s as

25    a Customs inspector writing books, the Scarlet Letter, but

1      eventually Salem sort of faded from view.

2          It was important though because the early United States

3      government depended entirely on Customs fees for its income.

4      It was 95 percent of all the income the government had.  We

5      were actually an admiralty court more than anything else.

6      Most of the cases the early court heard involved shipping,

7      admiralty, and Customs cases.

8          We were in Post Office Square, and then this courthouse

9      was constructed.

10         Harry Cobb was the architect, one of I.M. Pei's

11     partners.  The Pei Partnership has put its mark around the

12     world, but certainly on Boston:  The Christian Science

13     Center, the Kennedy Library, the Hancock Tower.  Further

14     afield, the Rock and Roll Hall of Fame, the East Wing of the

15     National Gallery in Washington.  If you've been to Paris,

16     that ingenious glass pyramid outside the Louvre is an I.M.

17     Pei work.

18         He did what I wish architects would do more often, is

19     that he spent a year talking to judges, lawyers, people who

20     use courthouses, and the public.  What did you want?  What

21     did you want to see in a courthouse?

22         And the design he came up with I think is brilliant.

23     We have essentially three courthouse built into one.  We

24     have the public courthouse, which is the atrium and

25     signature conoid glass wall, ten stories high, the largest

1   ever successfully constructed in the world.  They're usually

2   unsuccessful because glass is a very heavy medium.  It tends

3   to collapse.  But he came up with an ingenious trussing

4   system that keeps it in place.

5       Behind us is a second courthouse which is accessible to

6   only judges, law clerks, and jurors.

7       And behind there is a system where essentially

8   prisoners are transported to and from courtrooms by the

9   marshals.  The idea is that there is no intersection.

10  People do not cross paths except here in the courtroom

11  itself.

12      The signature themes of the courthouse are a blend of

13  Old New England.

14      The beehive brick entrance that you came through into

15  the courtroom was actually copied from a courtroom in

16  Wiscasset, Maine.

17      Cobb chose it for its old New England distinctiveness,

18  but then discovered there was only one mason alive in

19  America who still knew how to do that brickwork.  As it

20  happened, he was retired in Maine, was persuaded to come to

21  Boston, and trained a whole group of apprentice masons in

22  how to do this kind of work.  So we got not only the benefit

23  of the architectural feature but also kept this one

24  particular craft alive.

25      The decorating around the courtroom, that's copied from

1    a courthouse in Vermont.  Every courtroom has this same

2    theme, just different colors.

3         The benches are again copied after a Shaker style.  I'm

4    sorry they're so uncomfortable, but that was the Shaker

5    style.  It was, I think, to make you pay more attention by

6    not getting too comfortable as observers in the courtroom.

7         And then, of course, there's the blend of the modern.

8    You have the Old New England and the ultra modern New

9    England on the other side facing Boston Harbor; a modest

10   front looking at the old factory district in the Seaport,

11   and then a soaring historic glass wall facing the harbor

12   itself.

13        The other thing I will mention, and then I'll let the

14   lawyers go on to do their work, is that there is a

15   collection, and you saw it coming in, of Ellsworth Kelly

16   installations.  Ellsworth Kelly -- and these are the colored

17   panels that you'll find in the rotunda and at the end of

18   each of the courtroom floors, which is the third, fifth, and

19   seventh floor.

20        Kelly died I think a year-and-a-half ago, Paris trained

21   and the founder of what is called the hard-edged or

22   minimalist school of art, which is essentially best known by

23   its fascination of geographic shapes and a real passion for

24   national color.

25        When these installations first appeared -- and the

1    reason we have them in the courthouse is that in federal

2    construction you're required to put a certain percentage of

3    the budget into public art that is otherwise accessible to

4    the public.

5        The Kelly artwork was chosen by Justice Breyer on the

6    Supreme Court, who was very involved in this building, and

7    Judge Woodlock, who was also one of the planners.  He worked

8    with Cobb in bringing the building together.

9        And I have to say -- this is perhaps more a reflection

10    on me than anything -- when I first saw them, my first

11    reaction was, This can't be art because I could do it.  If I

12    could do it, it can't be art.

13        Then I realized I couldn't have done it.  If you had

14    sent me out to buy art for this building, I would have come

15    back with some insipid old paintings of ships that would

16    catch your interest for about ten minutes; whereas, I find

17    these Kellys, now that I understand them and I understand

18    what he was trying to do by putting a sense of modernness

19    color into the courthouse, I find them fascinating.  But I

20    will leave it for you to decide whether you think it's art

21    or not.  We can talk about it at the end of the trial.

22        I do want to mention one more thing because you will

23    see it.  At the bottom of the elevators there is big plaque

24    with a thousand names on it.  Those are the names of every

25    workperson who built this building.  And I will guarantee

1    you during the two weeks you're here you're going to see

2    someone down there with their grandchildren and children

3    going up and pointing out their name on the wall because

4    they are very proud of the courthouse, as we are.

5         So that is, by way of introduction, what I wanted to

6    tell you.  The more important things now are going to be

7    told to you by the lawyers.

8         We are going to begin with the opening statements.  The

9    government will go first, followed by Mr. Kendall for

10   Mr. Das.

11        Mr. Gallagher or Ms. Wan?

12             MS. WAN:  I will, your Honor.

13             THE COURT:  Very well, Ms. Wan, you may address the

14   jurors.

15             OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

16             MS. WAN:  Good morning, everyone.

17        The defendant, Abhijit Das, or "Beej" Das, ran for U.S.

18   Congress to represent Massachusetts' Third District, but

19   instead of running an honest campaign, the defendant

20   violated federal election laws for his own personal gain.

21        Now, the defendant told voters that he was a successful

22   businessman.  He owned a hotel in Tyngsborough,

23   Massachusetts called the Stonehedge Inn.

24        He owned another hotel in Brunswick, Maine, and a 108

25   foot megayacht that used to be docked right here in Boston

1  Harbor.  He chartered that yacht for private clients.

2      But you will learn that all of this was a facade.  The

3  defendant's businesses were underwater.  He was behind on

4  payments, and creditors threatened to turn off the lights or

5  to foreclose on the properties.  His accounts for his hotel

6  and yacht were often overdrafted, and his hotel employees

7  had a hard time getting paid.

8      His parents, who had the financial means to support

9  him, often stepped in.  They transferred tens of thousands

10 of dollars into his accounts, his bank accounts, to cover

11 yacht bills and hotel bills.

12     You will also learn that the defendant boasted that he

13 was a constitutional lawyer.  He had gone to the University

14 of Michigan Law School, and after that he worked for a

15 federal judge in Maryland.

16     But you will learn that instead of practicing the law,

17 the defendant broke the law, and he did so in three

18 principal ways.

19     First, he accepted excessive contributions, campaign

20 contributions that were over $100,000 over the federal

21 limit.  And he funneled that money through his parents'

22 account to make it look like it was his own money.

23     Second, the defendant syphoned $300,000 from his

24 campaign to spend on his hotel and his yacht.

25     And, third, the defendant was not truthful in filings

1    with the FEC, or Federal Elections Committee.  He covered up

2    the fact that he accepted those excessive contributions and

3    stole campaign funds.

4        Now, the evidence of the defendant's guilt will come to

5    you in various ways.  You will hear testimony from the

6    defendant's campaign staff, from his business associates,

7    and also bank employees, as well as FBI investigators.

8        You will also get a chance to review documents such as

9    emails, text messages, bank records.  But right now let me

10   summarize the evidence that you will hear about each of

11   these three crimes, starting with excessive and conduit

12   contributions.

13       You will learn that there are straightforward rules

14   governing how much an individual can contribute to a

15   congressional campaign.  And the evidence will show that

16   those limits are in place to prevent wealthy individuals

17   from having an outside effect on our elections.

18       You'll learn that for the 2017 to 2018 election cycle

19   an individual could contribute up to $2,700 for a primary,

20   and $5,400 for the primary and general elections combined.

21   This applies to donations.  It applies to loans.  It applies

22   to anything of value that's given to a campaign to influence

23   an election, or, in other words, to help the candidate win.

24       On the other hand, you will learn that there is no

25   limit to the amount a candidate can loan or contribute to

1     his own campaign.  But those funds must be the candidate's

2     personal funds.  It can't be money from other sources

3     disguised to look like the candidate's own money.  That's

4     cheating, and that's a crime.  It's called "conduit

5     contributions," and it means causing contributions to be

6     submitted in the name of someone who is not the true donor.

7          The evidence will show that the defendant knew these

8     rules, but he still solicited and accepted excessive

9     contributions from three individuals who gave $25,000,

10    $50,000, and $50,000, each.  And he hid the identity of

11    those true donors to make it look like those funds came from

12    his personal funds.

13         Those true donors were Toby Chaudhuri, Jay Shah, and

14    Ajoy Bose.

15         Toby Chaudhuri was a childhood friend of the

16    defendant's and a political consultant who worked on various

17    campaigns and political administrations.

18         Jay Shah was a wealthy businessman and a business

19    associate of the defendant.  He owns a portfolio of hotels

20    and is the CEO of a publicly traded company.

21         And Ajoy Bose, you will learn, was long-time family

22    friend who lived in California.

23         Chaudhuri gave $50,000.  Jay Shah gave $50,000, and

24    Bose gave $25,000, and the defendant hid the illegal nature

25    of these donations by funneling the money through his

1    parents' bank account to make them look like it was his

2    family's money.

3         Now, to understand the conduct, let's go back to August

4    of 2017.  That's when the Congresswoman for Massachusetts'

5    Third District announced her retirement.  Soon, ten

6    different candidates jumped into the election, including the

7    defendant, who announced his candidacy in September of 2017.

8         He began to assemble a political team, including a team

9    of political advisers.  And although he was advised to hire

10   a campaign finance manager and an election lawyer, he

11   didn't.  He said it was too expensive.

12        One of the first things his political consultants told

13   the defendant was that he would need to raise a significant

14   amount of money for a successful congressional run, and that

15   first quarter of fundraising, which ended December 31, 2017,

16   was particularly important.  That's because in an election

17   like this there wouldn't be a lot of polling, but every

18   single candidate had to report their fundraising totals to

19   the FEC, the Federal Elections Committee, and the public and

20   the press would use those fundraising totals to measure a

21   campaign's success, viability, and a candidate's popularity.

22        Without enough money, the defendant believed that if he

23   did not reach his fundraising goals, his campaign would be

24   doomed.

25        The defendant said it himself in an email to Ajoy Bose

1    dated December 11, 2017, in which he asked for financial

2    support.  He wrote, "12-31 is the one and only test of

3    financial viability that my campaign will likely face.  If

4    we meet our financial goals for this quarter, we will be

5    considered the front runner and follow on contributions from

6    further afield will flow."

7        The defendant's personal goal for the year-end quarter

8    was $450,000.  That's how much he wanted to raise.  But the

9    evidence will show that the defendant was a poor fundraiser,

10   partly because he did not prioritize the time-consuming and

11   humbling task of calling potential donors and asking for

12   contributions.

13       By mid December, with only two weeks left before that

14   year-end deadline, he'd only raised about $50,000.  That's

15   when he had a late-night conversation with his childhood

16   friend and political adviser Toby Chaudhuri.  He told him

17   that the campaign needed more money; that he's getting

18   significant sums of money from his parents, but it would not

19   be enough to reach his end-of-the-year goals.  So he asked

20   Mr. Chaudhuri for a $50,000 short-term loan.

21       Now, this is a critical moment because the evidence

22   will show that the defendant knew that this was 18 times

23   greater than the federal contribution limit.  The defendant

24   knew because he often talked about this maximum contribution

25   limit with his political advisers.  He talked about it with

1    potential donors who he emailed and asked to make the

2    maximum contribution, and you will get to see those emails.

3        The evidence will show that the defendant knew exactly

4    what he was doing, and he knew it was wrong.

5        And Mr. Chaudhuri will tell you that he also knew it

6    was wrong; that even though he knew it was wrong, he caved

7    to the defendant's pressure and he gave him the money.

8        Now, you'll get to hear from Mr. Chaudhuri, and you'll

9    learn that when he was first approached by FBI agents as

10   part of this investigation, he was scared, he was ashamed,

11   and he tried to lie his way out of it.  He told them that he

12   was never the defendant's political adviser, and when he was

13   asked about the $50,000 loan to the defendant, he said it

14   had nothing to do with the campaign.

15       Mr. Chaudhuri later got a lawyer, who negotiated an

16   agreement with the government, we call it an "immunity

17   agreement," in which the government promised not to use

18   Mr. Chaudhuri's words against him.  And Mr. Chaudhuri is now

19   testifying as part of that immunity agreement, in which he's

20   required to provide truthful cooperation.

21       The defendant also asked for $50,000 from Jay Shah.

22   This is the hotel executive.  And you will see in this email

23   dated December 17, 2017, that the defendant is telling

24   Mr. Shah that he's canceling a campaign fundraiser in New

25   York City.  And then he asks for a phone call.  He says,

"Toby and I are discussing what we need to do to get over
that $450,000 level by 12-31 even with some engineering."

Now, the evidence will show that the "engineering" the
defendant is talking about is engineering to get around the
campaign contribution limits.  And that engineering would
include funneling the money through his parents' account and
setting up a sham contract between Jay Shah and the
defendant's mother that makes it look like it was a personal
loan.

There was a third donor, Ajoy Bose, the family friend
in California.  And he was asked to give $25,000 on top of
the maximum contribution from him and his wife.

Now, the defendant referenced these three excessive
contributions in a text message with Mr. Chaudhuri.  This
was sent right after Mr. Chaudhuri had told the defendant
that he wired his $50,000.  And the defendant writes, "Thank
you for doing it.  I will aggregate and send as one batch.
Total," quote/unquotes, "'self-fund' will be close to
$250,000."

Now the defendant's own words "self-fund" are important
here for two different reasons.  First, the defendant knew
that legally there was no limit to the amount a candidate
could contribute or donate to his campaign.  There is no
limit to the amount a candidate could self-fund.

Second, by putting quotation marks around the term

1    "self-fund," the evidence shows that the defendant knew that

2    this self-fund was in fact a fraud and not a self-fund at

3    all.

4        So to aggregate these excessive contributions and make

5    it look like he was self-funding his campaign, the defendant

6    instructed each of these three donors to wire the money to

7    his parents' account, not the defendant's own account, and

8    certainly not the campaign accounts.

9        And you'll see that the evidence will make it clear

10   that these are campaign contributions because these -- the

11   purpose of these contributions was to support the campaign,

12   to make it seem like the defendant had a high fundraising

13   number, and to make it seem like the defendant was a viable

14   congressional candidate.

15       First, you'll hear from Chaudhuri and Shah who will

16   tell you that these were funds given to the campaign.

17       Next, you will see emails from his campaign, from his

18   email account, to each of these three donors talking about

19   the campaign.  He's asking for money for the campaign.  He's

20   not asking for money for his hotel business.  He's not

21   asking for money for his yacht business.

22       And finally, the timing of each of these contributions

23   will make it clear that these are campaign contributions.

24   You can see that each of these contributions all arrived in

25   the parents' account within about a day of each other, on

1    December 27 and 28, just days before that year-end deadline.

2    A hundred twenty-five thousand dollars from these three

3    donors.  The parents took that money and added $50,000 of

4    their own money, and that same day transferred the money to

5    a joint account held by the defendant and his mother.

6         Now, that very same day, still on December 28, the

7    defendant and his mother's joint account transfers $170,000

8    to the Das for Congress campaign account, and in this way

9    the defendant engineered these excessive contributions by

10   funneling the money through his parents' accounts to make it

11   seem like this was his own personal funds.

12        Let me pause here for a second to talk about the

13   $50,000 that the defendant's parents added to these

14   excessive contributions.

15        The evidence will show that the defendant's parents

16   gave a significant amount of money that was used for the

17   campaign, but the evidence will also show that that money

18   from his parents was not enough to meet the defendant's

19   fundraising goals.  He needed this boost from these three

20   donors and these three excessive contributions.

21        The evidence will also show that the defendant's

22   engineered first-quarter fundraising was quite impressive.

23   He proudly announced on January 16, 2018, that Beej Das

24   raised $425,000 in the first fundraising quarter.  And you

25   will learn that this put him third in a crowded field in the

1    primary election.  And he'd actually raised more than the

2    person who eventually won the campaign seat.

3        What people did not know was that a quarter of these

4    funds came from illegal excessive contributions, and he

5    could not have reached this goal without those excessive

6    hidden contributions, which brings us to the second part of

7    the defendant's illegal scheme, theft of campaign funds.

8        You will learn that political candidates cannot use

9    campaign funds for their own personal use.  But the

10   defendant withdrew $314,000 from his campaign funds to spend

11   on his hotel and his yacht businesses.

12       In early 2018 the defendant's businesses were

13   hemorrhaging cash, and they were in serious danger of going

14   under.

15       Around that same time, tellers at Lowell Bank --

16   Lowell Five Bank, noticed that the defendant was asking for

17   strange transactions, transactions that they thought didn't

18   make sense.  He was asking them to take out large sums of

19   money as cash and then immediately deposit that cash into

20   his business account.  So he would take out money from the

21   campaign and deposit it into his business account.

22       He made it clear that he didn't actually want any of

23   the cash and he didn't want it to appear as a transfer.  He

24   told them time and time again, Make sure that these

25   transactions are not linked.  Make sure that these are

1    separate transactions.

2        And here's an example on March 26, 2018, where the

3    defendant is taking out $20,000 from his campaign account.

4    And you'll see that about a minute later $20,000 goes into

5    his hotel account.

6        The defendant asked tellers to make sure that the

7    withdrawal slips did not show any transfer information, and

8    if he saw them writing the transfer information, he'd ask

9    them to redo the withdrawal slips.

10       So the tellers starting writing the transfer

11   information on the slips after the defendant left the bank,

12   and they also reported the defendant's transaction to their

13   compliance department.

14       Now, an FBI forensic accountant will tell you that

15   almost all of the funds withdrawn from the campaign account

16   went into the defendant's hotel and yacht business accounts.

17   And from there the funds were spent on business expenses.

18       This is just one example, where the defendant withdrew

19   $35,000 from his campaign account and used that money to

20   purchase a treasurer's check to the Town of Brunswick.

21   You'll learn that this check was used to pay off a tax lien

22   for the Maine hotel that was so overdue that the Town of

23   Brunswick threatened to foreclose on the property.

24       Other examples of his spending include paychecks to

25   hotel employees, other tax payments, new parts for his

1    yacht, bills for drink and food vendors at the hotel

2    restaurant, and electric and other utility bills, and

3    insurance payments.

4        The defendant also instructed Sean Smith, who was the

5    operations director for his hotel, to make similar

6    withdrawals and deposits.  And Mr. Smith will tell you that

7    during one of the first transactions he asked the defendant,

8    Is this okay?  Is this aboveboard, that we're taking money

9    from the campaign and using it for the hotel expenses?

10       And the defendant assured him that it was because he

11   was just repaying money that the defendant had loaned to his

12   campaign.

13       But the evidence will show that that was not true, that

14   that was actually a cover story to hide the defendant's

15   illegal scheme.

16       The defendant and Sean Smith withdrew money from the

17   campaign account about two dozen times.  Sometimes they took

18   money out several times a week.  And the total that they

19   took out was $314,000.

20       On the other hand, the defendant claimed that he had

21   contributed or loaned his campaign about $272,000.  And you

22   will see that part of that came from contributions from Das

23   and his parents, and another part of that was those

24   excessive contributions from those three individuals.

25       Well, the problem is you can't pay yourself back more

1    than you borrowed.

2        So after he repaid his loans, the $147,000 shown in

3    blue, the defendant kept taking out money.  He took out

4    money covering those excessive contributions, even though

5    Toby Chaudhuri will tell you that the money he gave to the

6    defendant was for the campaign.  It wasn't for the hotel.

7    It wasn't for the yacht business.  And in the end, the

8    defendant was taking out money that he got in from

9    individual contributors.  People who'd given 20, 100, 200

10   dollars.  And those people had no idea that their political

11   contributions were going to pay for defendant's hotel and

12   the defendant's yacht.

13       The defendant stopped making withdrawals after his

14   campaign account was almost completely drained.  With two

15   months left before the primary election, he had less than

16   $5,000 left in campaign funds.

17       Which brings us to the third and last part of the

18   defendant's illegal scheme; concealing material facts and

19   making false statements in filings to the Federal Election

20   Committee.

21       You will learn that campaign finance data must be

22   reported on a quarterly basis to the FEC by every

23   congressional candidate.  This includes donations, who made

24   the donations, how much they made, when they made them.  It

25   also includes any loans or repayments of the loans,

1    including loans from the candidate.

2         Candidates also have to report their expenses, how much

3    they spent out of their campaign accounts, and "cash on

4    hand," which means how much money they had available in

5    their coffers.

6         The defendant caused the Das for Congress campaign to

7    submit false reports that did not disclose that they had

8    received $125,000 in excessive contributions, and it also

9    misstated the cash on hand for March and June of 2018.

10        This chart shows in orange exactly what the campaign

11   reported to the FEC; whereas, the black line shows the

12   actual balance of the campaign account.  And you'll see that

13   in March of 2018 the campaign reported 398,000 in cash on

14   hand; whereas, the campaign balance was only 107,000.

15        In June the campaign reported 439,000; whereas, the

16   truth was the campaign had less than $5,000 in their

17   campaign account.

18         Now, the first two FEC reports were submitted by Eric

19   Chast, the defendant's fundraising director.  And you'll

20   hear from Mr. Chast that he repeatedly asked the defendant

21   for access to the bank accounts so he could fill out the

22   forms.  But the defendant never provided any bank account

23   access or any statements.

24        Instead, Chast input information provided by the

25   defendant.  The defendant provided a list of checks and a

1    list of the campaign expenses.

2         The defendant did not tell Mr. Chast about the $125,000

3    he took from those three donors, and the defendant did not

4    tell Mr. Chast that he took out funds for his hotel and

5    yacht business.

6         The defendant hid these facts for one simple reason;

7    because he knew he was committing a crime.  Here's an email

8    from the defendant to Eric Chast that shows the limited

9    amount of information he provided.  You'll note that this

10   email was sent at around 2:44 a.m. the day before the FEC

11   filings were due.

12        The defendant writes, "Eric, the following were cash

13   loans from Abhijit Das," himself, "to Beej Das for Congress

14   in December.  And he lists out three different loans.

15        For the first and the last loan, you'll learn that that

16   was money that came from the defendant and his parents, but

17   that loan in the middle, the 12/28/2017 loan for $1700, that

18   was the loan that included those excessive contributions

19   from those three individuals, from Chaudhuri, Bose, and

20   Shah.  And here the defendant is misleading Eric Chast about

21   the source of those funds because he says that that loan

22   came from himself, Abhijit Das.

23        Now, you'll learn that Chast relied on this information

24   from the defendant to calculate -- to fill out the FEC forms

25   and to calculate the cash on hand.  And Chast also asked the

1    defendant to review the reports before they were submitted.

2    All of the FEC reports were signed by the campaign

3    treasurer, Sean Smith.

4    Now, you'll remember Sean Smith.  He's the director of

5    operations for the defendant's hotels.  And he'll tell you

6    that he was the campaign treasurer on paper only.  In

7    reality, he had nothing to do with the campaign.  He did not

8    access the campaign bank account.  He did not review the FEC

9    filings before they were filed.  In fact, for the September

10   2018 report, the defendant told Mr. Smith that it was

11   paperwork to wind down the campaign.  And he slid the

12   paperwork across the desk, and Mr. Smith signed the

13   paperwork without looking to see what it was because he

14   trusted the defendant.

15   Now, neither Chast nor Smith knew that the FEC reports

16   were false.  But the evidence will show that the defendant

17   knew because the defendant was the one who accepted those

18   executive contributions.  The defendant was the one who

19   syphoned money from his campaign account into his

20   businesses, and the defendant was the one who was asked to

21   review the FEC reports before they were filed.

22   The truth is, if the defendant had -- the truth is the

23   defendant had to mislead the FEC.  Because if he was

24   truthful about the campaign's contributions, he would have

25   had to disclose those excessive contributions.  And if he

1  was truthful about the campaign spending, he would have had

2  to disclose that he used campaign funds for hotel and yacht

3  expenses.

4      The defendant was untruthful to the FEC because the

5  truth was he engineered conduit excessive contributions, and

6  he stole campaign funds.

7      And the evidence will show that the defendant knew what

8  he was doing.  He knew it was unlawful.  And he did it

9  anyway, and then he tried to hide the fact that he had done

10  it.

11      And for that reason, at the end of the case, after you

12  hear all the testimony, review the records and apply your

13  good, common sense, we will ask you to return the only

14  verdict supported by the evidence, and that's a verdict of

15  "guilty" on all counts.

16      Thank you.

17          THE COURT:  Thank you, Ms. Wan.

18      Mr. Kendall or Ms. Mahoney?

19          MR. KENDALL:  Thank you, your Honor.

20          MR. GALLAGHER:  Your Honor, may I have a second

21  with Mr. Kendall before he begins?

22          THE COURT:  Sure.

23      (Counsel conferred.)

24          MR. GALLAGHER:  Your Honor, we have two objections

25  to two exhibits.  Can I hand them up to the Court?

```
 1              THE COURT:  All right.

 2              MR. GALLAGHER:  On hearsay and relevance grounds.

 3              MR. KENDALL:  Your Honor, one of them is about four

 4    pages.  I'm only using a paragraph.  It might be helpful if

 5    I point it out.

 6              THE COURT:  The opening paragraph?

 7              MR. KENDALL:  No.  It's in the middle of it.  It's

 8    "promise, rewards and inducements," that I want to recite.

 9         (Pause in proceedings.)

10              THE COURT:  Fair enough.  You can use it.

11              MR. KENDALL:  Excuse me?

12              THE COURT:  The objection's overruled.

13              MR. KENDALL:  Your Honor, the timeline's not much.

14    It may not be in your view, but I think this is the best

15    spot for it.

16              THE COURT:  All right.

17         (Pause in proceedings.)

18            OPENING STATEMENT ON BEHALF OF THE DEFENDANT

19              MR. KENDALL:  Good morning.

20         If we could have the first slide, please.

21         Over the next 30 minutes, I want to cover four topics.

22    One is knowledge and intent, particularly my client's

23    knowledge and intent.  Then I will go through the three

24    topics that my colleague here raised, the loans, the alleged

25    conversion, or theft, and reporting.
```

1      I want to focus on knowledge and intent.  Because when

2   the government brings a criminal prosecution based on the

3   campaign rules, it carries a very heavy burden.  It has to

4   prove for each charge not only that Mr. Das broke the law,

5   broke the rules, but he did so with the intent and knowledge

6   to break the law.

7      So as you listen to the evidence, ask yourself, What

8   does this prove about intent?  What's shown about knowledge?

9   Is the government taking perfectly legal appropriate actions

10  and trying to twist them and present them in an inaccurate

11  way, or is the evidence more persuasive?

12     Because what's so remarkable about the government's

13  description of the evidence is how little it said about

14  intent and knowledge.  They want you to pass judgment on

15  Mr. Das, to judge his intent and knowledge, even though

16  you've never met him and you do not know much about him.

17     So to do your job, you will need to know a lot more

18  about what Mr. Das said and thought and did.

19     You will also need to know about his family and what

20  they did.  You will need to know about his hotel business

21  and the impact that it had on the campaign.  And for all of

22  these subjects, you will need to know a lot more than what

23  the government intends to show you.

24     This is a timeline (indicating).  You may want to refer

25  to it, or we may use it during the trial, but it's just to

1     keep a few dates in order.

2          Our first topic is the loans from the three family

3     friends.  Mr. Das and his parents asked their friends for

4     personal loans that they intended to put into a rainy-day

5     fund to cover problems at the hotels.  The Das family had

6     their own separate family money to loan to the campaign.

7     Under the rules, a candidate can lend as much money as they

8     want, as you heard.  The Das family intended to get their

9     campaign money from a condominium they sold in India, and

10    from nearly one million dollars in cash in their own bank

11    accounts and investments.  To be more precise, it was

12    $972,000.

13         Mr. Das discussed this with Mr. Chaudhuri.  What would

14    be the legal way to structure the loan to the campaign so

15    they could do it correctly?

16         And if Mr. Das's mother, who is a professor -- she's

17    Dr. Das -- she hadn't mistakenly moved $79,000 from the

18    wrong bank account, these loans never would have been an

19    issue in this case.

20         The campaign rules are highly technical and very

21    unique.  The campaign laws are enforced at two levels.  The

22    FEC, or Federal Election Commission, enforces them at a

23    civil, non-criminal level.  And they oversee a lot of the

24    filings and paperwork that you will hear about.  But they

25    only regulate election matters.  They don't regulate loans

1    to a private business, or personal loans to a candidate's

2    mother for her business investment.

3        So first let's talk about the background of Mr. Das and

4    the evidence on the three loans.

5        He grew up in North Andover.  He went to law school,

6    but he never worked with campaign laws, and he don't know

7    anything about them before the campaign.

8        In 2007 he stopped working as a lawyer and went to work

9    for Hilton Hotels in India.  He worked there and was quite

10   successful as an employee of a big company.

11       But if you want to understand about these three loans,

12   you should understand some things about his family and

13   cultural background.  While he was working in India, his

14   parents were still in North Andover, and both were past 70

15   years old.  His parents are now well into their 80s.  They

16   moved from India to Massachusetts, and they're from a group

17   in India known as Bengalis.

18       Bengalis come from the eastern part of India.  Bengali

19   families are known for pride of education.  Dr. Das is a

20   professor, retired from a university, and they're very

21   close.  The families are extremely close.  Children grow up,

22   but they don't grow away from their parents.  Adult children

23   show their parents great respect and deference.  Because

24   Mr. Das was their only child, and he's not married and he

25   didn't have his own children, they are a particularly close

1   and dedicated nuclear family.  They have each other, the

2   three of them.

3       So in 2012 Mr. Das left his job in India, moved back to

4   his parents' house in North Andover, and the three of them

5   decided to start a family business opening small boutique

6   hotels.  Mr. Das wanted to go from being an employee to

7   being an entrepreneur.  His parents had left their entire

8   estate to him in their wills, so they agreed to use his

9   inheritance to finance this hotel business.  His parents

10  wanted to be involved and help their son build a business.

11  It could be a legacy they accomplished with him.

12      The Das family owned about 40 percent of this hotel

13  business, and their family and friends were investors who

14  owned the other 60 percent.

15      Those numbers are important.  They owned 40.  Their

16  family and friends owned 60 percent.

17      This was a true mom-and-pop business.  They bought

18  hotels that were nice, but they were old, and if you've ever

19  owned an old building, you know what maintenance problems

20  are.

21      The hotels quickly ran into trouble.  In 2015 and 2016

22  pipes burst in the winter.  There was incredible flooding.

23  Hundreds of thousands of dollars of lost income, plus

24  damage.  The Das family had to loan the hotel hundreds of

25  thousands of dollars to keep the business going.  And even

though they only owned 40 percent of the hotel, they did
100 percent of the lending.  It was family and friends who
were the investors.  There was a sense of being protective
about people who do business with them.  And during the
times that the hotels were shut down, some for months at a
time, they paid all their employees, and they paid them
their health care.

I'd like to say they're old school when it comes to
their business, but they had to borrow money to do that, to
pay the salaries and health care and other things, and they
were paying as high as 12 percent interest on loans.  That
was a time when mortgage rates were 4 percent.

As many of you know, owning a small family business can
be very tough.

In 2017 Mr. Das made the worst decision of his life.
One that he owns.  One that he accepts the failure and
problems that came from it.

He thought the hotels might be in better shape.  That
is when he made a decision that, today in hindsight, looks
so foolish.  When the Congresswoman from Lowell announced
she was retiring, he saw this as an opportunity to fulfill
several dreams.  If he ran for Congress, he could push for
the issues he believed in; health care, protecting small
businesses.  He could become the leader of the Indian
community in the United States.

1        Though technically anybody can run for office in the

2    United States, in reality most political campaigns are for

3    people with lots of money, lots of money, and a team of

4    highly experienced political consultants.

5        Mr. Das had a naive but honest plan.  He thought he

6    could put the money his family borrowed into a rainy-day

7    fund for the hotels.  That way his management team could run

8    the business and he could shift his attention and run for

9    Congress.  He could take his own money and loan it to his

10    political campaign.

11        Can we have the next slide, please.

12        This slide that you can see on your screens is a

13    picture of a letter he sent to one of his employees in

14    November just before the loans took place.  And you see from

15    the yellow highlighting, what is he repeatedly saying?  We

16    have a cash reserve.  We're going to maintain our cash

17    reserve.  It can't be like in the past where I was borrowing

18    money to pay salaries for people and taking on debt.  I want

19    to have a cash reserve to set the business up.

20        That's why he borrowed the money from the three

21    friends.

22        In order to raise cash for the hotels and the campaign,

23    before he announced his candidacy, Mr. Das had set in a plan

24    to sell $300,000 in assets that he had in India.  He and his

25    mom jointly owned a condominium in Calcutta.  They sold it

1    for $255,000 in August of 2017.

2        The government knows this.  These document are sitting

3    in their database.  They may not have looked at it.  They

4    may not have talked about it, but they've been sitting on

5    these documents for years.

6        And he'd already started to liquidate his retirement,

7    the 401(k) plan of the Indian version in India.  So that was

8    the $300,000, to set up for these plans of his.

9        Well, things in India don't move as quickly as in the

10   United States.

11       He got $192,000 released quickly, but there was another

12   hundred thousand that got held up.  Luckily, he and his

13   parents had about a million dollars of liquid cash in their

14   accounts, and they decided they could use part of his

15   inheritance to finance his dream of running for Congress.

16       So in December of 2017, his mother borrowed $125,000

17   from three family friends to put into the rainy-day fund,

18   and he could loan a minimum of at least $250,000 to his

19   campaign from the family's own funds, including the condo

20   proceeds from India, 192,000.

21       Why does a family with close to a million bucks in the

22   bank borrow 125,000 from friends?

23       The money in the bank was left from the parents' life

24   savings and his savings.  The Das family had already

25   invested over a million-and-a-half into the hotels from

1    their life savings.  They made hundreds of thousands of

2    dollars of emergency loans in the past, when pipes burst,

3    when the floods came, when they were paying salaries.

4        Mr. Das realized it would put a lot of pressure on his

5    parents to expect them to bail out any future hotel problems

6    just from their own savings.  They owned 40 percent but made

7    100 percent of the loans.  They didn't want to pressure

8    family and friends that were their investors.

9        So they asked three friends if they would loan Mr. Das'

10   mother, Dr. Mitras Das, money that she could draw on if she

11   needed it for the hotels.  Many families in the Indian

12   community in the United States are very close to each other,

13   and they support each other financially.  You should not

14   find this cultural practice surprising.  Many other

15   immigrant groups in other communities here have similar

16   admirable close ties.

17       Separate from the loans from the family friends,

18   Mr. Das could take the entire 192,000 from the condo sale,

19   and he could take another 60 to 80,000 from savings.

20       Toby Chaudhuri was a Das family friend.  You heard

21   Ms. Wan mention him.  But more important, he was the

22   national chair of the Das political campaign, a highly

23   experienced political consultant and by far the most

24   influential adviser to Mr. Das and the campaign.  Mr. Das

25   had never before run for office or a political campaign.

1    Mr. Das looked at Mr. Chaudhuri for his advice on most

2    campaign issues.

3         Could we have the next slide, please.

4         Take a look at the slide in front of you.  This is what

5    they discussed to do.  The goal there would be a hundred

6    twenty-five thousand they could borrow from family friends.

7         The blue is the close-to-a-million dollars they had in

8    their own accounts.  They kept them separate.  One goes to

9    the business.  One goes to their campaign.  A perfectly

10   appropriate way to do it.

11        Could we have the next slide, please.

12        You'll see this is a Bank of America account that they

13   talked about where things were being transferred out of.

14   You can see the $192,000 coming in from India just in

15   December at the same time that the three loans took place.

16        So what was the problem?

17        Dr. Das, Mr. Das's mother, had always managed the bank

18   accounts for the family.  Her father had been a prominent

19   banker in India, and she liked that role of being the person

20   to manage the bank accounts.  She always kept track of

21   family funds and wired money from different accounts.  That

22   was what she did.

23        Unfortunately, the money from the condo sale went into

24   the same account as the money from the three family friends.

25   And when she wired them out, she didn't look to separate

1    what went from where.

2         If we could have the next slide, please.

3         You'll see here this is a graph of all the family bank

4    accounts.  Those blue lines above the red all have more than

5    $79,000 in them.  Dr. Das could have taken the money from

6    any of those five accounts, or six accounts, wired the money

7    with the condo money, and there would have been no claim

8    about the funds.  The fact that she didn't realize she had

9    to keep them strictly separate, or maybe she should have

10   kept them strictly separate, is why we have this problem.

11        If we could have the next slide, please.

12        This is what we're talking about.  That red is the

13   money, the $79,000, that the government has a problem with.

14   The blue is all of the other money they could have just

15   taken it from for that small portion of the red.  That is

16   what this loan issue is about.

17        No one's blaming Dr. Das.  She was just transferring

18   funds between accounts as she'd repeatedly done before.

19   Clearly her son should have given her better directions to

20   keep the money separate.  But in this family, and in Bengali

21   culture in general, children don't micromanage their

22   parents.  They respect them and they defer to them.  He had

23   no idea the funds would be mixed together for their

24   transfer.

25        There's an old saying, "Money is fungible."  People

1    also say, "All money is green."  That means money's

2    interchangeable, and you can use it interchangeably without

3    problems.  That may be true in a lot of businesses, but

4    under the FEC rules, the government gets upset, and that's

5    why they brought these charges.

6        The government asked you to pretend that the only money

7    the Das family had was in this one account at

8    Bank of America where the three personal loans and the

9    proceeds from the condo were held together.

10       It wants you to pretend the other $972,000 didn't

11   exist.  They pretend it didn't exist in the family bank

12   accounts, and it didn't exist in Mr. Das' intent and

13   knowledge.

14       Before Mr. Das ran for Congress, he didn't know

15   anything about campaign rules regulating loans.

16       So how do we know he thought this was a legal way to

17   raise money?  Because he discussed it with his closest

18   campaign adviser, Mr. Chaudhuri.  And Mr. Chaudhuri agreed

19   it was okay.

20       Could we have the next slide, please.

21       This is a picture of Mr. Chaudhuri, and these are

22   things he wrote about the loans before the government came

23   to him.  And you will hear he said, "We did it carefully.

24   We did it the right way in 2017 so there wouldn't be a legal

25   problem."

1          So why does the government say that Mr. Chaudhuri will

2     say something different?  Why do they claim that there is a

3     problem?

4          Two reasons.

5          Mr. Chaudhuri will say something different first

6     because when the Das family went bankrupt and lost the

7     hotels and lost a lot of their money, it took them a long

8     time to pay back Mr. Chaudhuri the $50,000, and he was

9     livid.

10          The second reason is when the government interviewed

11     Mr. Chaudhuri, as they referenced, they didn't like his

12     original story, and they threatened him into changing his

13     story.

14          Three years ago the FBI was looking at the records from

15     the campaign and they went to speak to Mr. Chaudhuri.  He

16     didn't say there was anything wrong with the loan.  The

17     government interviewed a second time.  And again he didn't

18     say there was a problem.

19          So what happened?  The government stopped the second

20     interview and made it clear to Mr. Chaudhuri that the

21     government didn't accept what he was saying.  And they made

22     it clear that he was putting himself at risk with the FBI

23     and the U.S. Attorney's Office.

24          Mr. Gallagher and the FBI agent had a further

25     conversation with Mr. Chaudhuri's lawyer and told the lawyer

1    that the government did not accept his statement, knowing

2    that the lawyer would relay this to Mr. Chaudhuri in an

3    attorney-client privileged conversation.  That means

4    Mr. Chaudhuri can discuss things privately with his lawyer

5    about what the government said, and I can't get answers from

6    him because it's a privileged conversation, and you can't

7    hear what was related through the lawyer.  It's a standard

8    government technique to pressure witnesses to change their

9    story.

10        The FBI, who was present, was supposed to write all of

11    this down in the FBI reports because that's what the reports

12    are supposed to be, an honest, straightforward, and complete

13    telling of what happened.  None of this showed up in the FBI

14    record of the interview or the reports.

15        So we wrote a letter and we asked what was missing,

16    tell us what happened.  And the government finally did give

17    us a response, and I will read you some quotes from it.

18        "During that brief interview, I indicated to

19    Mr. Chaudhuri and his counsel that I had some concerns about

20    the truthfulness of Mr. Chaudhuri's statements and indicated

21    we should discontinue the interview for Mr. Chaudhuri to

22    speak with Attorney Peabody.  Shortly after that meeting,

23    although I cannot recall the specific details, I probably

24    also expressed some concerns to Attorney Peabody about the

25    credibility of Mr. Chaudhuri's statements."

1        And then it goes on, "Prior to the third interview that

2    took place on June 3, 2021, my assumption is that Attorney

3    Peabody had conversations with Mr. Chaudhuri that would be

4    subject to the attorney-client privilege."

5        If Mr. Chaudhuri had kept saying to the government what

6    he said in those letters that you read, what he told the

7    government in two interviews, that the loans were not for

8    the campaign, the government either would have indicted him

9    or threatened to indict him.

10        Could I have the next slide, please.

11        If he changed his story just ever so slightly, they

12    would let him go.

13        Take a look at the screen that's in front of you.

14        Mr. Chaudhuri's given two versions of what happened.

15    The blue version is what he said before the government

16    threatened him.  And what he said -- his version was, "The

17    condo money and the self-fund would go to the campaign, and

18    the hotel money would be the three loans."

19        No problems.  No issues at all to be concerned about.

20        After the government threatens him, what does he now

21    say?  "Well, they scrambled the money up.  Some condo money

22    goes to the campaign.  Some condo money goes to the loan."

23        I ask you -- you're going to hear in this case that

24    Mr. Chaudhuri is a 20-year-experienced political consultant.

25    He's been around the block when it comes to campaigns, and

1    he is the adviser that Mr. Das relies on.

2        Mr. Das is a newcomer to politics.  But he's a lawyer.

3    He's in business.  He's not stupid.

4        If they could do it the right way and use the condo

5    money with a little bit of the family money, why would they

6    want to do it the wrong way?

7        The only reason the government can even make this

8    argument is simply because Dr. Das did not separate out

9    where the $79,000 came from to top off the condo money.

10       At the end of this trial Judge Stearns will instruct

11   you on the legal definition of "reasonable doubt."  You will

12   see that a person like Mr. Chaudhuri, who changes his story

13   when the government doesn't like it, is walking reasonable

14   doubt.

15       Now, I've shown you that a candidate may not be able to

16   borrow money from friends to put into a campaign, but he and

17   his family could borrow money during a campaign to put into

18   a private business.  You may think that sounds like a

19   workaround or a loophole or something that's not very

20   kosher.  But remember, senators and members of Congress

21   wrote these campaign laws to regulate themselves, and they

22   gave themselves this flexibility.  Whether you think it's a

23   good law or a bad law, it doesn't matter.  Because as jurors

24   you must apply the law as Judge Stearns instructs you.  You

25   cannot apply a different law to Mr. Das.  You must apply the

1    version Congress passed for itself.

2        Now let's talk about the conversion of the campaign

3    funds.

4        They are claiming he stole $314,000 or some amount of

5    that.  Mr. Das used his $314,000 for the campaign committee

6    to repay the personal loans he had given to the campaign.

7        They gave you this chart that is an absolute

8    misstatement of the facts.  Remember this chart from the

9    government that shows Mr. Das gave 272 and took out 314?

10   They're light by at least $54,000.

11       We have a spreadsheet we're going to give the

12   government.  You see it has Bates numbers here.  It's mostly

13   documents they've been sitting on for the last few years.

14   In Mr. Das' campaign reports he listed about $55,000 or

15   so -- I don't remember the exact number at my fingertips --

16   of money he had put into the campaign through his credit

17   cards.  It's there in the reports.

18       They don't want to see it.  They keep it out of here.

19   It's all documented in here.  Their witnesses told them

20   about it, and they didn't follow up when the witnesses told

21   them about it.  They've been sitting on the documents.  They

22   haven't gone through it.  Mr. Das put in at least $325,000

23   of his money into the campaign.

24       So when he takes out 314, technically the campaign owes

25   him money, but obviously he's not going to get it.  The

1     campaign's out of money.

2          The point is simple.  He put the money in; he can take

3     it out.  He can take out as much as he put in.

4          And the fact that they pretend it doesn't exist just

5     says what they're going to do.  It doesn't say what you're

6     going to see in terms of evidence.

7          And what was this fund for?  It's paying for like the

8     Internet service at campaign headquarters, paying for

9     registration fees for the democratic party, paying for the

10    campaign vehicle.  All standard routine charges that Mr. Das

11    gave.  Many of them they gave to the campaign consultant.

12    They're talking about Mr. Chast, that Mr. Chast didn't put

13    into the reports or that he overlooked and reported

14    incorrectly.

15         But the point is, Mr. Das put in more money into that

16    campaign, documented on the FEC reports, documented on

17    documents they've been sitting on for at least three, four,

18    five years, and they weren't going to mention to you.

19         Now let's talk about the way that money was paid back.

20         The government has this issue that Mr. Das took the

21    money from the campaign and had a separate transaction to

22    put it into the business.

23         Can we have our next slide, please.

24         What you have to understand is what Mr. Das was doing

25    was the campaign had borrowed the money from him personally.

1    So if you owe someone personally a loan, who do you pay

2    back?  The individual.

3        Once Mr. Das got that money, he could whatever he

4    wanted with it because it was his personal funds.  And so he

5    took his personal funds, and he put them into the family

6    business to make payroll, to pay taxes, to help out the

7    60 percent of the owners that he wasn't asking for for

8    money, and he tried the keep the businesses afloat.

9        If you take a look, I have two different diagrams.  On

10   one it's how any normal person would pay back the loan.

11   You'll see the line number one is Mr. Das putting money into

12   the campaign.  The line two is the campaign paying him back

13   for his personal loan.  And then he separately puts that

14   money into the business.  That's how it should be reflected

15   because that was the transaction.

16       He didn't have an account at the Lowell Five, so he

17   couldn't put it through his own bank account.  He just had

18   to go to the counter and do it.  And why did he go to the

19   counter and do it?  You'll see there's notes in the

20   business, at the bank actually, that Mr. Das couldn't wait

21   the two days the bank would sit on checks to hold -- to keep

22   their money, for free use of your money.

23       The hotel business needed the money immediately.

24   Perhaps some of you understand what it's like when you can't

25   wait for a check to clear for two days and you need the cash

1    right away.  That is what this business was like, and that's

2    what was going on.

3        If we could have the next slide, please.

4        The FEC that regulates these reports and these forms,

5    they have specific rules on what they expect you to do with

6    a personal loan.  And one is when you pay yourself back, you

7    list yourself as the recipient of the funds.

8        What he was doing is exactly what the federal

9    government expects all candidates to do.

10       You see the list in front of you?  It's off the FEC's

11   database.  Anybody can look it up on the Internet.  It lists

12   the highest people who -- the highest amounts of loans taken

13   out in the 2018 congressional races.  You see a lot of these

14   loans are in the hundreds of thousands of dollars.

15       You'll also see each candidate paid themself back

16   individually.  They didn't tell you what they did with the

17   money after they paid themselves back.  Maybe they went on a

18   vacation.  Maybe they bought a piece of real estate.  It's

19   not the FEC's business.  They want to see if you made a

20   personal loan and the personal loan is paid back, it's going

21   to the source of the funds, the candidate.  It's not some

22   other destination that the candidate may want to put the

23   funds.

24       That's the -- we just picked those numbers out, the

25   highest loans in the FEC.  There's 1354, I think, candidates

1    who borrowed money, who lent money to their campaign, and

2    then paid themselves back.  That's just the first page going

3    by the highest numbers first.

4         Can we have the next slide, please.

5         You can see the results from the campaign, it was an

6    absolute disaster.  Mr. Das got 1400 votes.  He finished way

7    down.  It was a complete fault for him to even think that he

8    could ignore the hotel business and spend his family

9    resources there.

10        Why was he doing this and taking the money out of the

11   campaign and putting it into the business?  Because it was

12   pretty clear that he wasn't going to win.  It was pretty

13   clear that he had a campaign.  They had incredibly good

14   candidate.  The chief of staff to the mayor of Boston raised

15   three or four million dollars.

16        Lori Trahan, who won it, and worked for a congressman,

17   she raised over two -- close to $3 million.

18        They had huge political machines of operatives and

19   experts.

20        He was just some guy who thought, Gee, I should run.

21   Maybe something could happen.

22        So during that 2018 time period before the campaign

23   when the business started having problems, they couldn't

24   make payroll, they had to pay people's health insurance,

25   they had to cover the tradesmen coming in to do work, he

1    figured, Better put the money into the hotels than waste it

2    on the campaign.

3         Now let's talk about the reports.  It's the last of the

4    three issues that the government has focused on in the case.

5         They claim that Mr. Das caused the campaign to file

6    inaccurate campaign reports.  When the campaign files its

7    report describing what happened in the prior three months,

8    it's supposed to say how much cash was sitting in the bank

9    account on the last day of that three-month period.  All

10   that the campaign finance director has to do is check the

11   monthly statement for the campaign bank account and report

12   how much cash is sitting in the account.

13        Unfortunately, the consultant hired by Mr. Das never

14   looked at the bank account and reported the wrong number.

15        This is the simplest of the three issues.

16        She said that he will testify that he repeatedly asked

17   for the bank accounts.  That's not what he said in the grand

18   jury.  It's not what he said before.  I don't know how they

19   got him to buff up his testimony or make it different than

20   what he said before, but that's not what has been his story

21   prior to hearing it today.

22        This is the simplest of the issues.  The FEC rules are

23   absolutely clear.  The candidate has no responsibility to

24   complete, to review, to supervise, or to file campaign

25   reports.  If there are inaccuracies in the report, that's

1    not Mr. Das' responsibility, and he certainly doesn't have

2    criminal liability for them.

3        You again may be thinking about these campaign rules

4    and being a little bit skeptical.  How can it be that the

5    candidate has absolutely no responsibility to file anything?

6    Remember, representatives in Congress and Senate and

7    senators, wrote those rules to regulate themselves.  They

8    put this protection for candidates in the rules.  And just

9    as senators and congressmen wrote the rules to limit their

10   own responsibilities, they also limited the obligations of

11   the candidates like Mr. Das, who got a tiny number of votes,

12   and had never served in Congress.

13       This is a excerpt from the book that the FEC issues for

14   all congressional candidates.  It's like a guidebook, how to

15   do things right, how to follow our rules.  It's something

16   they put on their website.  We'll have FEC witnesses coming.

17   We'll have them testify about it.

18       What do they put on page 79 on their "How to Run for

19   Congress" handbook?  An entry that says, "Candidate does not

20   report campaign activity.  Apart from filing a Statement of

21   Candidacy" -- saying you're going to run, that's all, that

22   you're going to run -- "a candidate has no personal

23   reporting obligation under the Act.

24       "If a candidate receives contributions, obtains loans

25   for campaign activity, or makes disbursements, he/she is

1    acting as a campaign agent.  The transactions are reported

2    by the principal campaign committee."

3         On the forms that they're talking about, Mr. Das

4    doesn't submit them.  He didn't sign them.  There's no place

5    for him to have a certification or an acknowledgment that he

6    had anything to do with the forms.

7         Could we have the next slide, please.

8         Now, I want to show you -- this is the witness they

9    talked about just a moment ago, about Mr. Chast.

10        Mr. Chast -- if we could have the slide, please.

11        Mr. Chast was the person hired.  His company got

12   $10,000 a month for Mr. Chast and one other person

13   supposedly to provide guidance and run things for the

14   campaign.  Ten thousand dollars a month, that's a lot in the

15   campaign world.

16        And when Mr. Das asked him about the FEC filings, what

17   does he say?  "I do this for you."  That is their sale

18   pitch.  I take care of all of this so you can go out and you

19   can ask for votes, and raise money, and you don't have to

20   deal with the paperwork.

21        And Mr. Chast was the finance director of the campaign.

22   And I ask you, have you ever heard of somebody who is a

23   finance director of an organization who never read the

24   organization's bank accounts?

25        He never read them at all.  And there were other people

1  that -- there were several people who could have given him

2  access.  He just didn't pursue it.

3       And you know why?  Because when Mr. Das went in to hire

4  Mr. Chast's company, they told him, We are the pros.  We ran

5  Seth Moulton's campaign for the first time he ran for

6  Congress.  We know how to deal with first-time candidates

7  who know nothing about the process.  We are the pros.

8       What they didn't tell him was Mr. Chast had never

9  worked on a federal campaign as a finance director before.

10 He was way out of his league.

11      They may have helped other federal congressional

12 candidates, but the person they assigned to Mr. Das'

13 campaign had no experience with the FEC.  That's why he

14 filed things without looking at bank accounts, and he made

15 other mistakes.

16      There is an old saying, "Success has a thousand fathers

17 but failure's an orphan."

18      Several of the government's witnesses are going to make

19 clear they don't like Mr. Das.  When he had businesses and

20 money to spend, they were happy to work with him.  When his

21 finances crumbled, when he was in bankruptcy and having

22 failure, they felt they were owed money or let go, and they

23 became critical of him.

24      But you're not here voting in a popularity contest.

25 This case is about the application of very technical rules

1    to the evidence.

2         You'll learn many things about Mr. Das in this trial.

3    You will learn he's an intelligent man who went to law

4    school, but his law degree is irrelevant to the issues in

5    this case.

6         You'll learn that he had a successful career in school

7    and at Hilton Hotels, but he failed as an entrepreneur and

8    as a candidate.

9         You'll also learn that he and his parents wanted to

10   build a family business together, but they lost it to

11   bankruptcy.

12        We also see he was naive to think he could run for

13   Congress and keep his hotel business going, and he owns

14   that, and he will own it for the rest of his life.

15        You'll see lot of disappointment and mistakes, how a

16   once-successful person was humbled and failed in a very

17   public way.

18        But you will not see a knowing and intentional fraud or

19   deception.  You will not see a crime.

20        Mr. Das withdrew money out of the campaign bank

21   account, as was his legal right, and he repaid loans to

22   himself.  And remember, he put a lot more in than he took

23   out.

24        He took this same money and put it into his business to

25   pay salaries and taxes and for health care.

1      You'll see a close, loving family that shared

2   everything, money, dreams and failure.  But they didn't

3   steal money or benefit from these problems.  They lost more

4   than anyone else.

5      And that's why at the end of this case we will present

6   our closing argument and ask that you return a verdict of

7   "not guilty" on every count in the indictment.

8      Thank you.

9          THE COURT:  Thank you, Mr. Kendall.

10     All right, Jurors, you've heard two excellent opening

11  presentations.  You can see from the divergences that a jury

12  is going to be required to decide this case.

13     But conveniently lunch has just arrived.  Enjoy the

14  lunch.  I will have Marsha check with you at 1:30 to make

15  sure you're comfortable.  We'll start whenever you feel

16  ready to go, but no sooner than 1:30.  And I will have you

17  out of here by four o'clock this afternoon.  So it should

18  make the commute a little easier.

19     So the jurors will be excused for lunch, and we'll see

20  you at 1:30 or thereabouts.

21          THE CLERK:  All rise.

22     (Recess.)

23          THE CLERK:  All rise.

24     (Whereupon, the Court entered the courtroom.)

25          THE COURT:  All right.  The jurors are on their way

1    down, so what is our issue?

2         MR. GALLAGHER:  There is an exhibit we intended to

3    not admit, really out of concern possibly there might be

4    hearsay.  And what the exhibit is is that Eric Chast sent an

5    email to the defendant about the forms he filed with the

6    FEC 3.  And in that was a link.  And the exhibit we are

7    going to introduce now is a link to instructions about how

8    to fill out the form.

9         I believe the argument against it was that there was no

10   evidence, other than receiving the link, that Mr. Das

11   actually looked at.  But since the defendant has shown now

12   really an instruction manual to the jury giving them a slice

13   of -- really what we think is an inaccurate picture of

14   obligations, the fact that Mr. Das received something and

15   what it says, we think, is relevant based upon that opening

16   statement.

17        MR. KENDALL:  If I may be heard, your Honor.

18        If you took take a look at Exhibit 23.  It's the FEC

19   instructions for the FEC Form 3.  My client has no

20   obligation to file a Form 3, to review a Form 3.  There is

21   no signature place for him.  He's truly -- this is the whole

22   issue that the FEC has set up.  The client -- the candidate

23   has no responsibility for the form that they have the

24   instructions.

25        If you read the wording of what Mr. Chast said, he

1    said, Please see the reporting instructions.  If you have

2    any questions, give me a call.

3        He didn't say, You have to read them, or, Read them and

4    come back to me.  He said, Please see them if you have any

5    questions.

6        I don't believe this witness will testify he ever

7    discussed it with my client; my client in any way ever

8    acknowledged reading the link that was there.

9            THE COURT:  Sounds like perfectly good

10   cross-examination to me.

11       All right.  It's admittable.

12           MR. GALLAGHER:  Your Honor, do you want the witness

13   on the stand?

14           THE COURT:  Somebody's going to have to be on the

15   stand in a minute because the jury is outside.

16           THE CLERK:  You can put him on.

17       (Pause in proceedings.)

18           THE CLERK:  All rise for the jury.

19       (Whereupon, the jury entered the courtroom.)

20           THE CLERK:  Court is open.  You may be seated.

21           THE COURT:  Welcome back.  I hope the lunch was

22   satisfactory.  It is the best the federal government can

23   offer.

24       All right.  Let's call our first witness.

25           THE CLERK:  Please raise your right hand.

1          **SCOTT FERSON, sworn**.

2              THE CLERK:  Thank you.  You may be seated.

3          Can you please introduce yourself, spelling your last

4    name for the record?

5              THE WITNESS:  Sure.  I'm Scott Ferson, F-E-R-S-O-N.

6                      **DIRECT EXAMINATION**

7    **BY MR. GALLAGHER**

8    Q    Mr. Ferson, good afternoon.

9    A    Good afternoon.

10   Q    Would you please tell us how old you are, sir?

11   A    How old I am?  I'm 61.

12   Q    What do you do for work?

13   A    I run a public affairs and public consulting firm called

14   Liberty Square Group.

15   Q    You're doing that for how many years?

16   A    Twenty-four years.

17   Q    What does Liberty Square Group do?

18   A    We do a number of things.  We do lobbying, strategic

19   consulting, communications work for for-profit companies,

20   nonprofits, and political candidates.

21   Q    You're doing this for how many years?

22   A    With Liberty Square, for 24.  But before that I had

23   worked for a congressman and U.S. senator and worked on

24   campaigns.

25   Q    Let's talk about that prior experience.

1              Who were the political candidates or

2     representatives you've worked for?

3     A    Well, on the Senate staff for Senator Kennedy, and then

4     for his reelection campaign in '94 and subsequent elections.

5              The presidential campaign for Congressman Gephardt

6     in 1988.

7              And in minor roles in other presidential campaigns.

8              And then as a consultant for Congressman Stephen

9     Lynch from 2001 to today.

10             Congressman Seth Moulton.

11             Governor Patrick and Lieutenant Governor Murray.

12             District attorneys, a number of candidates on the

13    local level.

14    Q    Sounds like you've been involved in a lot of campaigns.

15    A    A lot of campaigns.

16    Q    What is your particular role in political campaigns?

17    What do you do?

18    A    So my background is -- again, I was one of Senator

19    Kennedy's press secretaries.  So my background is in

20    communications.

21             I play that role for currently-now Senator Markey,

22    and Speaker of the House Ron Mariano.  So that's my

23    particular expertise.

24             But for Seth Moulton, for instance, I was his

25    general consultant.  So it's that person who comes in and

1    sort of just overlays what the strategy might be, in

2    addition to my communications work.

3    Q    How far did you go in school?

4    A    I have an undergraduate degree in political science from

5    UMass Dartmouth, and a masters in strategic public relations

6    from George Washington.

7    Q    Do you do any teaching?

8    A    I teach about elections in congress at Stonehill

9    College.

10   Q    Mr. Ferson, are you also involved in something known as

11   the Blue Lab?

12   A    Yes.

13   Q    Tell us what Blue Lab is?

14   A    The Blue Lab is a political incubator that trains

15   college-aged students how to run campaigns.

16   Q    And is that part of the Liberty Square Group, or is that

17   part of your teaching?

18   A    It's -- well, it's part of Liberty Square, in that I own

19   Liberty Square and I own the Blue Lab.  The Blue Lab is a

20   nonprofit that specifically is a training program that works

21   on -- we pair them with campaigns.

22   Q    Mr. Ferson, do you know the defendant in this case,

23   Mr. Abhijit, or "Beej," Das?

24   A    I do.

25   Q    Can you please tell us where he is sitting and what he

1    is wearing.

2    A   He is sitting to my right in a blue suit.

3         MR. GALLAGHER:  Your Honor, may the record reflect

4    that the witness has identified the defendant?

5         THE COURT:  It may.

6    Q   Mr. Ferson, can you explain to us how it was that you

7    met Mr. Das?

8    A   I had -- actually was introduced by a mutual friend who

9    was somebody who had worked at the Liberty Square Group.

10   Q   And that mutual friend, what was his name?

11   A   Eric Cafori [ph.]

12   Q   How did you know Mr. Cafori.

13   A   I've known Mr. Cafori for a long time as a consultant

14   when he worked for the J. Thorp [ph.] Company, and I was

15   consulting with -- and then he joined my firm for a period

16   of time.

17   Q   So what was the purpose of your meeting, Mr. Ferson,

18   with Mr. Das?

19   A   It was a little bit of a unique situation for us in that

20   it was an open congressional seat.  I had worked on the last

21   time the congressional seat was open for Eileen Donoghue,

22   who was the Mayor of Lowell who ran and came in second to

23   Congresswoman Tsongas.

24        So we were approached by a number of campaigns,

25   since -- I also -- when I first started working, my first

1    job was working for an acting congressman at the time.

2    Q    Let's talk about this open district.

3          Are you familiar with the Third District, the

4    federal district, of Massachusetts?

5    A    Yes.

6    Q    What basic geographic area does that cover in the

7    Commonwealth?

8    A    It -- from Haverhill sort of south, south of Lowell and

9    then west along the New Hampshire border.

10   Q    Do you know -- I'm sorry.

11         Do you know who the current member of the U.S.

12   House of Representatives is representing that particular

13   congressional district?

14   A    Yes.  Lori Trahan.

15   Q    You mentioned a person by the name of Niki Tsongas, who

16   is that?

17   A    Niki Tsongas was the Congresswoman after Congressman

18   Meehan left the seat.  She was elected in a special election

19   and served until she retired.

20   Q    And you mentioned Representative Tsongas decided not to

21   seek reelection?

22   A    Yes.

23   Q    And what then happened?  Did you start to receive phone

24   calls from other potential candidates?

25   A    I did.  My first call proactively was to then-Senator

1    Donoghue, I helped elect her to the State Senate, to see

2    whether she was interested in running again for it.

3    Q    And state Senator Donoghue, did she end up joining or

4    participating in the election?

5    A    No, she ended up not running for the seat.

6    Q    So once that happened, Mr. Ferson, did other candidates

7    reach out to you to potentially retain your services in this

8    campaign?

9    A    Yes, some who got into the race and some who did not.

10   At the time there were a number of people who were looking

11   at it.

12   Q    And was Mr. Das one of the individuals who approached

13   you?

14   A    Through Eric, yes.

15   Q    Where was your first meeting with Mr. Das?

16   A    It was on his yacht.

17   Q    Can you describe to us what the yacht looked like?

18   A    It was big.  It was part of his business.  You know, he,

19   I think, had -- there was an event on the boat.  So it -- I

20   don't know that I went down below, but we sat -- it was a

21   nice day and we sat outside.

22   Q    When was this approximately, Mr. Ferson?

23   A    Other than the weather was nice, I'm not sure I can

24   specifically remember.

25   Q    Was it before the election?

1    A    Oh, yes, well before.

2    Q    The election cycle we're talking about, what were the

3    years that took place?

4    A    Was it '18?  So this would have been in '17, 2017.

5    Q    So again, Mr. Ferson, what was the purpose of the

6    meeting you had with Mr. Das and Mr. Cafori on this yacht?

7           Before I get there, where was the yacht parked

8    or -- no one "parks" their yacht, but where was it?

9    A    It was a marina in Boston.  I'm not familiar with

10   marinas but something close to the -- you know, that long

11   hotel that's down there.

12   Q    So what was the purpose of the meeting you had with

13   Mr. Das?

14   A    At that point I think -- I always considered those to be

15   introductory.  It's kind of unclear where it will lead.

16   Sometimes people just want, because of my experience, just

17   want to meet, and I'm pretty forthcoming about what I think

18   it takes to run, and usually talk to people about why

19   they're talking about the race that they are looking at.

20   Q    You mentioned you talk to them about things that they

21   need to have in order to run?

22           Did you give any advice or guidance at that time to

23   Mr. Das about the amount of money that would be needed to

24   perhaps win a congressional campaign?

25   A    Yes.  It's actually one of the first questions because I

1    think a lot of people -- a lot of people are encouraged to

2    run, but there are some truths to running for a

3    congressional district in Massachusetts in a primary.  And

4    the ones that I have worked on and the ones I have observed

5    over the previous sort of decade all cost between 1.5 and

6    1.7 million dollars.  So if you don't have a lot of money or

7    the ability -- the network ability to raise it, it's sort

8    of -- you know, doesn't last very long.

9    Q    Is that what you told Mr. Das?

10   A    I believe so, yes.

11   Q    Did Mr. Das say anything about his ability to finance or

12   raise money?

13   A    Yes.  He clearly was a person of means, it seemed to me.

14   We were meeting on his yacht, and he had, from my

15   observation, a successful hotel business.

16          But for me it's always, Do you have a network of

17   high-worth individuals who can write checks for $5200, which

18   is the federal maximum.

19   Q    Did Mr. Das say anything about having a network of

20   individuals from whom he could obtain funds?

21   A    He left the impression with me that he was quite

22   confident about that.

23   Q    Did he say anything else in particular about what type

24   of network he had access to?

25   A    Well, he had done international business.  He was a

1    hotel executive.  You know, I didn't need a lot of

2    convincing he had a network.

3           I had just come off of the Moulton campaign, who

4    also had a huge network and successfully raised money.

5    Q   At that point, Mr. Ferson, while you were on the yacht,

6    did you learn anything about Mr. Das' background or work

7    experience?

8    A   Just generally.  It was more of a conversation.  It

9    wasn't an interview, the way I took it.

10   Q   How long did this entire meeting take place?

11   A   I don't know.  Not more than an hour is my guess.

12   Q   Did you have a subsequent meeting with Mr. Das at your

13   office here in Boston?

14   A   Yes.  When Senator Donoghue decided not to run, we

15   started holding more formal, what I would call, interview

16   meetings with my entire staff and some Blue Labers.

17   Q   What was the purpose of those meeting with the Blue Lab

18   staff?  What were you trying to do?

19   A   Well, both -- we were perhaps interested in working on a

20   campaign for somebody else if there was a fit.  And I was

21   looking forward to doing the race for Senator Donoghue, but

22   that wasn't going to happen.  So we were wide open.

23          And then for the Blue Lab, the best way to learn is

24   to be in the room, so we would let them participate as well.

25   Q   Let me ask you this, Mr. Ferson.  Do you recall how many

1    different potential candidates that you interviewed in

2    addition to Mr. Das during this process?

3    A    Maybe six.

4    Q    You mentioned the Blue Lab.  The Blue Lab are college

5    students?

6    A    College students.

7    Q    And during the meeting with Mr. Das, can you tell us who

8    was present and what happened?

9    A    So it would have been whoever from my staff wanted to

10   participate.  Maybe there were five or six people in there.

11   And my -- you know, we met again with half-a-dozen.  So I

12   don't know specifically who may have been in the office at

13   the time.

14          And if there were Blue Labers in the office at the

15   time, we would have let them participate as well.  So maybe

16   from the LSG side six to eight.

17   Q    In addition to Mr. Das, did Mr. Das come with anybody

18   who was associated with his campaign?

19   A    For that, he may have brought a person.  But normally

20   for sort of these it's get to know -- see if there's a fit

21   with the candidate.  So I don't remember there being an

22   entourage, if you will.

23   Q    Was there a subsequent meeting in which other folks came

24   that were associated with the campaign?

25   A    Yes.  So after we met with the six, one or two who may

1    not have actually gotten into the race, if I remember

2    correctly, I sort of put it to my office, and everybody

3    unanimously wanted to work with Mr. Das.

4    Q   Mr. Ferson, can you tell the jury what was it about

5    Mr. Das that impressed you and the Blue Lab that you decided

6    to choose him as the candidate you were going to work for?

7    A   He's impressive.  He's smart.  He's well-educated.  His

8    background was nontraditional for -- you know, not the usual

9    path to running for Congress, being a state rep being a

10   state senator.  That appealed to us.

11        The Blue Lab's specific mission is to elect

12   first-time female or people of color to office, people who

13   don't have traditional access to the political process.  So

14   he checked off a lot of the boxes that -- but, also just as

15   a person, his background, while not traditional for a

16   politician, if you will, was impressive.  And I, as a

17   communication's person, I could see a story that we could

18   tell.

19   Q   By this second meeting or the third meeting, what did

20   you know about his professional background, Mr. Ferson?

21   A   Just the hotel that he ran in Tyngsborough.  He also had

22   other properties.  He had a background at Hilton, and that

23   that was his -- you know, he was an accomplished

24   businessman.

25   Q   Do you know whether or not he went to law school?

```
 1   A   Yes.

 2   Q   Did he talk about his legal experience in a certain way?

 3   A   I think he referred to himself often as a constitutional

 4   scholar.

 5   Q   Again, the second meeting, I asked you who else was with

 6   Mr. Das at that point.

 7           Did Mr. Das ever appear at the Liberty Square Group

 8   with a person named Toby Chaudhuri?

 9   A   Yes.

10   Q   Can you tell the jury, who is Toby Chaudhuri?

11   A   Toby Chaudhuri, when I met him and being -- having done

12   this for a long time and Toby having done it for a period of

13   time, we may have crossed paths before, but I don't

14   specifically remember that.  But he was somebody not unknown

15   to me as a strategist.  And it came as -- often on campaigns

16   you'll find somebody who's a very good friend who's in the

17   business but is coming both in a role as a senior strategist

18   and as a friend.  So he was there in that role and a

19   campaign manager.

20   Q   What could you tell from what you saw between Mr. Das

21   and Mr. Chaudhuri about the nature of their relationship?

22   A   It seemed to me to be very close.  I remember Toby

23   saying that, you know, I'm here to protect Beej.  "Protect"

24   not in any -- you know, look out for him.  You know, as he's

25   running for Congress, it can get hard.
```

1    Q    So in addition to Mr. Chaudhuri, was there also a person

2    by the name of Luke or Lucas Seibert who was the first

3    campaign manager?

4    A    Yes.

5    Q    When did you first see Mr. Seibert?

6    A    I think it was at that meeting.  I'm not sure I was

7    familiar with Mr. Siebert.

8    Q    Do you know how long Mr. Siebert was the campaign

9    manager for the campaign?

10   A    I don't know.  Although the campaign was not at that

11   point very old.

12   Q    Okay.  Did the campaign go through more than one

13   campaign manager for the life of the campaign?

14   A    Yes.

15   Q    Talk to us about that.  How many different campaign

16   managers did the campaign actually have?

17   A    If there were -- I knew when Lucas left, which was

18   shortly after we were retained.  You need a campaign

19   manager.  So that's sort of job one.  And if there were

20   steps in between Brennan Spencer coming on, who is somebody

21   we would have recommended, I don't remember that.

22          But I remember Luke being there for a very short

23   period of time, and then Brennan Spencer, who I've worked

24   with on other campaigns.

25   Q    I want to talk about Brennan Spencer a little bit later,

1    but let's first talk about when you then decided, you and

2    the Blue Lab group, to take on Mr. Das as its client.

3              What did you agree to do for the Das for Congress

4    campaign?

5    A    So certainly communications, because that's our

6    expertise, and my office does that -- likes to do that on

7    campaigns when we're hired.

8              But the general consulting role was sort of just

9    that.  You're there, and as campaigns are ramping up, you're

10   in position to focus on message and strategy, sort of a path

11   to victory.  You know,overseeing a budget being drawn up,

12   the specific hires that's needed for the people who actually

13   run the campaign on a day-to-day basis.

14   Q    In addition to yourself, did you assign anybody else

15   from your company, Liberty Square Group, to also work on the

16   campaign?

17   A    Molly Horan, who had been with me for a number of years

18   at that point and had been with me actually to work for

19   Senator Donoghue and back to my office to help with

20   communications and really run that on a day-to-day basis.

21   It was her first campaign in that full-time sort of role, if

22   you will, on a campaign, with -- working with me and Eric,

23   Eric Chast, in my office.

24   Q    What role did Eric Chast have in the campaign?

25   A    Eric came to me about six months earlier.  He's my

 1    business manager, having come from a political fundraiser.

 2    Q    Mr. Ferson, did you ever have any discussions with

 3    Mr. Das or other members of the campaign about the

 4    importance of fundraising during the first quarter of this

 5    election?

 6    A    Yeah, quite often.  The -- you know, really campaigns

 7    for Congress at this point are not complicated, and the

 8    first phase is not -- you know, there's not real debates.

 9    There may be forms.  No one is really paying attention to

10    them.  It's important to raise money, and it takes a lot of

11    time to raise money.  You have to be very disciplined about

12    it.

13    Q    What does that usually involve?  How does a candidate

14    raise money?

15    A    You -- it's working with somebody in -- you know, to

16    develop the list of people that you can contact.  So we need

17    to take from the candidate the list of people who will then

18    lead to contributions.  It's very time-consuming to put that

19    list together.  And that's very time-consuming to make the

20    calls because you're not reaching most people on the phone

21    at the first try.  So you're sitting -- it's not glamorous

22    work.  You're sitting and what we say, "dialing for

23    dollars."

24    Q    Is that often referred to as "call time"?

25    A    Call time.

1    Q    Now, when you agreed to work for the Das for Congress

2    campaign, did you sign or create a document, something

3    called a "statement of work"?

4    A    Yes, we would have.

5    Q    And if you look at the folder in front of you, I would

6    like to show you what's in evidence as Exhibit 1, and if you

7    can tell the jury what that is once it comes up on the

8    screen.

9         MR. GALLAGHER:  And I believe, your Honor, we need

10   the PC for the prosecution table.

11        THE CLERK:  It's on.

12   A    This was a "statement of work."

13        MR. GALLAGHER:  I think the defense wants it shown.

14        THE COURT:  Excuse me?

15        MR. KENDALL:  We have no objection.

16        THE CLERK:  That's your screen.  HDMI1.

17     (Pause in proceedings.)

18     (Exhibit published to the jury.)

19        MR. GALLAGHER:  Can everyone see that okay?

20     (Jurors nod affirmatively.)

21   Q    So tell us, Mr. Ferson, what we're looking at.

22   A    That's a "statement of work."

23   Q    The statement of work is what?

24   A    It just outlines what we will do for the campaign.

25   Q    I would like to go to the very last page first, page 4

1    of 4, and ask you, do you recognize the signature there?

2    A   Yes.

3    Q   Is this -- this document is dated December 15, 2017.

4    Did you actually begin working for the campaign before this?

5    A   I don't remember exactly when, although looking at the

6    document, since it says November 15, I assume it was before

7    that.

8    Q   I would like to go to page 2 of this document.  It

9    refers to "The Blue Lab."

10   A   Hm-hmm.

11   Q   Do you see that?

12   A   Yes.

13   Q   I just want to --

14           MR. GALLAGHER:  Can we highlight that for the jury

15   so they can see that.

16   Q   And here it says, "The Blue Lab is a campaign incubator

17   within LSG and the brainchild of Scott Ferson and Sean

18   Sinclair."  Who is Sean Sinclair?

19   A   Sean Sinclair is a colleague of mine.  I've done work

20   with him for a number of years on campaigns.  He has an

21   expertise in putting budgets together, doing mail, some

22   media, and has a strong background, having done it for

23   Senator Sanders' presidential campaign, for Harry Reid in

24   Nevada, and other places.

25   Q   Do you know whether or not Mr. Sinclair ever did any

1    work for the Das for Congress campaign?

2    A    Other than -- I believe he put the budget together.

3    Because he -- it's fairly straightforward for the campaign,

4    but then his work would have been towards the end leading up

5    to September where you're on TV and you're setting up mail.

6    But nothing at this point other than participating in

7    messaging.

8    Q    So Mr. Sinclair is responsible for all those glossies we

9    get in the mail that clog up our --

10   A    Not all of them.  Just the ones he sends out, yes.

11       (Laughter.)

12   Q    So if you go to the third of four page.

13           I want to focus now on the topic here that says

14   "fundraising."

15           Now, Mr. Ferson, is this a standard statement of

16   work, or did you adjust it at all based upon the client you

17   were representing?

18   A    We would adjust it depending on what the client's needs

19   are.

20   Q    And can you describe to the jury what's laid out here as

21   far as the assistance the Liberty Square Group would provide

22   the Das for Congress campaign with regards to fundraising?

23   A    So again the fundraising is really maximizing the

24   candidate's contacts.  So all of the bullets here are meant

25   to be that person who's sitting with the candidate during

1    call time, if you will.  Lists are prepared.  You know,

2    recordings of whatever the promises might be, thank you

3    notes that go out.  All of that work.

4    Q   If you go to the next page, please.

5         MR. GALLAGHER:  The top of page 4, if we can just

6    highlight where it says "Scott Ferson will serve..."

7    Q   Now, Mr. Ferson, this part of the statement of work,

8    what is this discussing?

9    A   Just the roles of the three people that are going to

10   staff it.

11   Q   And so you're the general consultant to the campaign,

12   and that means precisely what, Mr. Scott [sic]?

13   A   So it really -- what it means is that -- you know, I

14   know how these campaigns are run, how you can win them, and

15   we're going to put a strategy together to do that.

16   Q   I apologize.  I think I just called you "Mr. Scott,"

17   Mr. Ferson.

18   A   That's okay.

19   Q   From your experience, do you actually interact act with

20   the press about how the campaign is going?

21   A   Some general consultants might not.  I do.  I've got

22   deep relationships with the press in Massachusetts and

23   nationally.

24   Q   It says here that "Molly Horan will manage

25   communications and messaging strategy deliverables."  Can

1    you explain what that means?

2    A    Yes.  So "deliverables" are press releases.  You know,

3    you always want to consistently tell a story.  So we would

4    work -- you know, you would work with pollsters and other

5    people to know what messaging works and resonates with the

6    electorate, and those need, you know, to be written.

7    Q    And last it says, "Eric Chast will manage all

8    fundraising strategy and requests."  What does that mean?

9    A    Eric came over to LSG as a -- with a fundraising

10   background.

11   Q    Do you know whether or not Mr. Chast ever had any prior

12   experience working on a federal campaign?

13   A    I don't.

14   Q    The other question I have, Mr. Ferson, do you know

15   whether or not he had prior experience or expertise in

16   submitting reports to the FEC?

17   A    I don't.

18            MR. GALLAGHER:  You can take this off the screen,

19   please.

20   Q    Mr. Ferson, how would you describe the success, or lack

21   of success, in fundraising for the Das for Congress campaign

22   during the last quarter of 2017?

23   A    It was anemic to barely present.  It was very hard to --

24   there were -- not successful.

25   Q    Why do you say that, sir?

1    A    Because it -- it's very much a disciplined set of tasks

2    you have to do.  If you're not sitting in a room with a

3    telephone making phone calls, you're not fundraising.

4    Q    Did you talk to Mr. Das directly about that issue?

5    A    Yes, in the context of -- because you can see how much

6    money is being raised, so, you know, if you can raise money

7    some other way, that's fine, but he wasn't raising money.

8    Q    And, Mr. Ferson, do you know what the term "cash on

9    hand" means?

10   A    Yes.

11   Q    What does "cash on hand" mean?

12   A    It's literally that.  So you've got -- there's a burn

13   rate to campaigns.  Money comes in; money is spent.  What is

14   left is your cash on hand.

15   Q    You say "burn rate."  What does "burn rate" mean?

16   A    When you're paying expenses as part of the campaign.

17   Q    What do campaigns, in your experience, Mr. Ferson, use

18   the money they raise from individual contributors, what do

19   they use that money for?

20   A    Most of it, the bulk of it, at the end of a campaign is

21   used to buy advertising.

22   Q    For what purpose?

23   A    Well, name recognition persuasion.

24   Q    How important is it in your estimation and your

25   experience, Mr. Ferson, for the campaign in the very first

1    reporting quarter for a campaign to have a large cash on

2    hand?

3    A    It has become important.  Whether it actually is

4    important is a different question.  But it has become

5    important because the press and media think that it's

6    important.

7    Q    Did you have conversations with Mr. Das about the

8    importance of that number?

9    A    Yes.

10   Q    Did you do anything to try to improve the fundraising

11   that was not happening with the Das for Congress account?

12   A    I'm not a fundraiser, but as the person who is

13   communicating with the reporters, I impressed upon him the

14   importance of having a number that would impress the press

15   at the end of the quarter or he would not be considered a

16   viable candidate by the press.

17   Q    And if the campaign doesn't have that money, what

18   typically happens in your experience, Mr. Ferson?

19   A    It's a spirling cycle.  If you don't have -- well, if

20   you don't have enough money to pay your bills, that's a

21   problem.  That wasn't the case here, I don't believe.

22        But if you don't have enough money to show to the

23   press, and through them the public, that you're going to

24   have money to advertise to get your name known and your

25   message across, the press won't take you serious.  And they

1   start to tier viable candidates from nonviable candidates,

2   particularly in multiple-candidate fields.

3   Q    In this particular race, do you recall how many

4   different candidates there were in the race?

5   A    There were six or seven or eight, I think.

6   Q    Is that a crowded field?

7   A    For an open seat, not necessarily.  But it's -- if --

8   from people observing it, not many people are really focused

9   on them, so the press is really watching it.  It's a crowded

10  field to get press attention.

11  Q    I want to take you, Mr. Ferson, now toward the end of--

12  towards the end of 2017.

13          Did the fundraising for the Das for Congress

14  campaign improve?

15  A    No.

16  Q    Did you have a conversation with Mr. Das about his

17  ability to self-fund the campaign?

18  A    Yes.  And we may have had that even going back to the

19  meeting on the yacht, which is that there's -- very wealthy

20  people can run for office.  And whatever we might think

21  about that, that's just the fact.  And if you're wealthy and

22  can self-fund, as candidates do all the time, that's one way

23  to fund a campaign.

24  Q    What was Mr. Das' response?

25  A    That he could do that.

1    Q    And did you ever ask him about how he was going to be

2    able to self-fund his campaign?

3    A    No, because it seemed evident to me that he had the

4    ability and resources to do it.

5    Q    Mr. Ferson, are you familiar with this idea of

6    "opposition research"?

7    A    Yes.

8    Q    What is "opposition research"?

9    A    I think -- the public thinks it's finding out stuff

10   about your opponents, but really research is an important

11   part of campaigns where you hire a firm to basically scrub

12   every public record of the candidate so that you know -- so

13   that way you're not -- I never want to be in a position to

14   get a call from a reporter asking me something I don't

15   already know.

16   Q    Do you know whether or not you tried to get any type of

17   opposition research into Mr. Das before he was running for

18   Congress?

19   A    There is a firm -- I work with several firms.  So

20   there's a firm I like that had worked on the Moulton

21   campaign that I thought had done a really nice job and set

22   up a meeting for her for Mr. Das.

23   Q    Did that meeting take place?

24   A    It did.

25   Q    Do you know if there was any type of opposition research

1    that actually got done?

2    A    She was never retained.

3    Q    Whose decision was it not to retain the person to

4    conduct any opposition research?

5    A    Ultimately, all of these decisions are the candidate's.

6    It's the candidate's campaign.

7    Q    Do you know whether or not the campaign had an election

8    attorney or a campaign lawyer that was assigned that was

9    giving Mr. Das any type of advice about campaign finance

10   laws?

11   A    I don't.  And from the first meeting I just considered

12   Toby Chaudhuri to be filling that role, not as the attorney,

13   but as the person looking at those things.

14   Q    You mentioned the spending of campaign funds.  What kind

15   of expenses do campaigns have that they need campaign funds

16   for?

17   A    So again the bulk of it, 75 percent of it, is paid

18   advertising, the TV ads that you run.  You know, now some of

19   it is quite inexpensive Facebook ads, but it's mail and TV

20   are quite expensive.  The bulk of what you raise is -- goes

21   to that.

22   Q    Do you know whether or not the Das for Congress campaign

23   had a campaign office?

24   A    Eventually it did, yes.

25   Q    Where was that campaign office?

1   A    In downtown Lowell.

2   Q    Was there also campaign headquarters?

3   A    I'm not sure I understand the distinction.

4   Q    Let me ask you differently.

5            Was there a storefront and also a personal

6   residence?

7   A    There was a storefront and a personal residence.

8   Q    Let's talk about the personal residence first.  Where

9   was that?

10  A    That was in a mill -- converted mill building in

11  downtown Lowell.

12  Q    Was Mr. Das living there?

13  A    I believe so.

14  Q    What else was happening at this apartment in downtown

15  Lowell?

16  A    I think -- well, it should have been call time.

17  Q    Why do you say "it should have been call time"?

18  A    Because that's what the candidate should be doing almost

19  the entire day.

20  Q    In addition to the residence, you mentioned there was

21  also a storefront.

22  A    It was a storefront.

23  Q    What was happening at the storefront?

24  A    Not much.

25  Q    Why do you say that?

1    A    There was no need for the storefront.  If you don't have

2    a lot of campaign staff -- I think there's this sense that

3    campaigns are populated by lots of people stuffing envelopes

4    and sending out mail and stuff.  And at that stage in the

5    campaign there's just one or two people that are working

6    with the candidate on a daily basis.

7    Q    Do you know whose decision it was to fund a storefront

8    and a campaign headquarters in Lowell?

9    A    I believe it was Mr. Das.

10   Q    Mr. Ferson, how did the campaign do as far as cash on

11   hand during the end of 2017?  What was the approximate

12   number the Das for Congress campaign was able to achieve?

13   A    I don't remember.  I don't remember there being a focus

14   on it.  I remember the intense focus being on the amount

15   raised.

16   Q    Why is that a distinction?

17   A    Well, if, again, the press are going to criticize a

18   campaign, there's two ways they can do it.  One is, You

19   haven't raised enough money like the others.  The other is,

20   You don't have enough to buy the things you're going to need

21   to at the end of the campaign.

22        I don't remember that being a problem.

23   Q    Do you know whether or not Mr. Das ended up self-funding

24   the money that became the final number at the end of 2017?

25   A    I do.

1   Q   How do you know that?

2   A   Because the number minus that was not going to be --

3   rise to the level that he would remain a serious candidate

4   going into the election year.

5   Q   Did you say anything to Mr. Das to encourage him, in so

6   many words, to write a check to the campaign?

7   A   Yes.

8   Q   And describe to us, what do you mean by that?

9   A   I laid it out in terms of how it would be perceived,

10  that we needed to report a number that would not be

11  laughable to observers.  Because of his resume, he's

12  considered a serious candidate.  He meets -- he gets to the

13  starting line.  But then if you're not hitting your marks as

14  you go along, as several of the other candidates were, he

15  would not be taken seriously.

16  Q   After -- so at the end the quarter, four quarters in a

17  year with the FEC?

18  A   Four quarters in the year.

19  Q   After the end of the quarter, how soon after the quarter

20  ends does the campaign publish that number to the public

21  about the amount of cash on hand?

22  A   They become public on -- they become public 15 days

23  after the filing is due.  So January 16 in this case for the

24  fourth quarter of '17.  January 16 of '18 they would be

25  public.

1          But if -- there's this sort of ritual that goes on

2     that if your number is quite high, you self-report it almost

3     immediately, so January 2, January 3.

4     Q   Do you know whether or not after -- around January 15th

5     or 16th, whether the Das for Congress campaign published

6     that number in a press release?

7     A   It did, yes.

8          MR. GALLAGHER:  If we could have in evidence

9     Exhibit No. 2, please.

10         (Exhibit published to the jury.)

11    Q   Can you tell us what we're looking at here, Mr. Ferson?

12    A   This is a press release.

13    Q   It has two contacts on here, Scott Ferson and Molly

14    Horan?

15    A   Yes.

16    Q   Do you know, between the two of you, who wrote this?

17    A   Molly would have written it.

18    Q   Do you know whether or not your client, the candidate,

19    Mr. Das, looked at it before it was submitted to the press?

20    A   I don't know that we would have done it any differently

21    than we always do, which is the candidate approves anything

22    that goes out public.

23    Q   Have you ever sent out a press release without running

24    it by the candidate beforehand?

25    A   No.

```
 1    Q    Now, here when it says --

 2         MR. GALLAGHER:  And if you could just raise the

 3    first paragraph so we will see that a little closer.

 4    Q    When it says, "Today, Beej Das, Democratic candidate for

 5    Congress in Massachusetts' Third Congressional District,

 6    announced that he had raised $425,000 in the fourth

 7    quarter," what did you understand that to mean?

 8    A    Raised his money that has been taken into the campaign.

 9    Q    Can that include not just donations but self-funding?

10    A    Yes.

11    Q    And that term "self-funding," Mr. Ferson, what do you

12    understand "self-funding" to mean?

13    A    A lot of campaigns, if they hit a period where they need

14    to have money in a campaign, the candidate will write a

15    check as a loan to a campaign.

16    Q    And that money for self-funding, what's your

17    understanding as far as whose money that is?

18    A    That has to be the candidate's money.

19    Q    Mr. Ferson, why do you say it has to be the candidate's

20    money?

21         MR. KENDALL:  Objection, your Honor.

22         THE COURT:  Overruled.

23         MR. GALLAGHER:  You can answer, Mr. Ferson.

24    Q    Why was that money, if it's personal money, have to be

25    the candidate's money.
```

1    A    If it's not the candidate's, it's considered a

2    contribution that has limits.

3    Q    And during the 2017-'18 election cycle, were there

4    limits?

5    A    Yes.

6    Q    What were those limits?

7    A    I believe they're -- they get bumped up every cycle, but

8    they're -- it may have been 4,800 to $5,200 per person, half

9    primary, half general election.

10   Q    So you can spend that much on the primary, and then the

11   second tranche is on the general?

12   A    I can contribute that to a candidate as an individual.

13   Q    How does one find out what the contribution limits are

14   for an election cycle?

15   A    They're published, you know, so any -- as part of the

16   fundraising, and this works for people who we represent now,

17   sometimes somebody will write a check larger than that that

18   has to be returned.

19   Q    So if a campaign gets a check that is larger than the

20   contribution limit, what should be the practice as far as

21   accepting or not accepting the money?

22   A    You -- if it's above, you, I believe it works on the

23   federal level the same way it does in the state, you have to

24   cut a check from the campaign to the person back for the

25   excess.

1    Q    Okay.

2            Going back to this press release here.

3            When it says "his campaign's first fundraising

4    quarter, and that his campaign currently has $550,000 cash

5    on hand," what did you understand that to mean, Mr. Ferson?

6    A    In the bank.

7    Q    So as of what date?  As of what date?

8    A    As of what date?

9            Well, that -- you try to put as good a face on your

10   press release as possible.  It could be that the 550 cash on

11   hand was from January 15.

12   Q    Did you have conversations with members of the press

13   about Mr. Das' campaign, about his cash on hand?

14   A    The money raised and the cash on hand, yes.

15   Q    Can you talk to us about that?  Explain to us what you

16   did.

17   A    More the money raised.  You know, there were a couple of

18   candidates who were very aggressive fundraisers and would

19   have reported their numbers early on.

20           Dan Koh, Rufus Gifford also had personal resources

21   as well but were very successful in fundraising.

22           We, as you can see from the press release, did not

23   let reporters know what money was going to be reported until

24   it became public.  So I had to have conversations to explain

25   why and how it was going.  The belief behind that is it's

1    not going very well.

2              MR. GALLAGHER:  We can take this off the screen.

3    Q   So you mentioned you got the got impression that Mr. Das

4    was running a successful business.  What gave you that

5    impression?

6    A   Everything that I could see made it successful, but

7    also, since I do talk to the press a lot through these

8    things, not once did a reporter say to me, Has he got

9    business problems?  Which is also another way that you kind

10   of find out whether your campaign has an issue.

11   Q   Did you ever get a chance to go through his books and

12   records of his business to see if that was true?

13   A   I never have for any campaign I ever worked on, and,

14   frankly, I didn't see a need for it.

15             If I felt that he didn't have the means to do what

16   needed to be done on the campaign, I might -- or if I didn't

17   see a sense that there were means there and he said, I could

18   write a check for an enormous amount of money, I might ask a

19   question where that was coming from, but I didn't feel the

20   need in this case.

21   Q   Going back to the cash on hand.

22             Did you ever have an opportunity to look at any

23   type of bank statement or financial record to verify that

24   that cash on hand on January 16, 2018, was actually more

25   than a half-million dollars?

1    A    I did not.

2         But I would have said to Molly, The numbers have to

3    be accurate.  Because if they're not accurate and a reporter

4    can look at what's being reported and it's different from

5    what we were saying in the press release, that's a problem.

6    Q    Do you know who from LSG, Liberty Square Group, was

7    working with Mr. Das in order to try to get that number to

8    be accurate?

9    A    I don't specifically.

10   Q    So we talked about different campaign managers.  You

11   mentioned a person early on by the name of Brennan Spencer.

12   Did you try to assist the campaign in getting a campaign

13   manager?

14   A    Yes.  Part of the role of general consultant is if you

15   have spots filled, they need to be filled, and we would help

16   with that.

17   Q    Was one of the spots that was not filled that of

18   campaign manager?

19   A    After Lucas left, yes.

20   Q    What does the campaign manager do in your experience,

21   Mr. Ferson?

22   A    They would run the day-to-day campaign.  You know, you

23   want the candidate to be the candidate.  In this case,

24   meeting voters who are at this early stage raising money,

25   and then the mechanics of how the campaign is run is run by

1    the campaign manager on a day-to-day basis.

2    Q    Did you recommend someone in particular for the Das for

3    Congress campaign?

4    A    I did.

5    Q    Who was that?

6    A    Brennan Spencer.

7    Q    How do you know Mr. Brennan Spencer?

8    A    I knew him from -- we had -- I had been a general

9    consultant for Andy Vargas, who had been elected to the city

10   council and then a state representative from Haverhill,

11   which is part of the district.  And he had done, I thought,

12   a nice job on the campaign.

13   Q    Why do you think he would have been a good addition for

14   the Das for Congress campaign?

15   A    Beej was a first-time candidate.  So he needed somebody

16   who knew how to do the mechanics of a campaign, build lists

17   and all that stuff.

18   Q    Mr. Ferson, are you familiar with a product known as NGP

19   VAN, letters N-G-P hyphen VAN?

20   A    I am.

21   Q    What is that?

22   A    As I understand it, it's what we would call a voter

23   file.

24   Q    Have you ever used it?

25   A    In 1988 on the Gephardt for President campaign, it was

1    printed out on paper, and you used a pencil to check off

2    voters.  I have never used anything electronically, but I

3    understand that that's the modern way of keeping track of

4    things on NGP VAN.

5    Q    So did you have any involvement in helping set up the

6    NGP account for the Das for Congress campaign?

7    A    No.

8    Q    Any involvement in setting up different fields or data

9    entry for this product?

10   A    No.

11   Q    Do you know if Eric Chast did?

12   A    I don't.

13   Q    In addition to Brennan Spencer, did you also -- was

14   there a person who came to the campaign around the same time

15   named LA, as in the letters L-A, Harris to join the

16   campaign?

17   A    Yes.

18   Q    Tell the jury, who is LA Harris?

19   A    LA Harris is a fundraiser.

20   Q    Did you know LA Harris before this campaign?

21   A    I believe so in another congressional campaign.

22   Q    What was LA Harris supposed to be doing for the campaign

23   as far as you know?

24   A    Since the fundraising wasn't successful, you have to

25   find someone who his a fit with the candidate to run call

1    time, and LA Harris had quite a good track record of doing

2    that.

3    Q    So we finished the last quarter of 2017, and now we're

4    into the first quarter of 2018.  Did fundraising for the Das

5    for Congress campaign improve at all?

6    A    Not that I can recall.

7    Q    Why do you say that?  How do you know that fundraising

8    had not improved?

9    A    I'm not as familiar with the numbers after that, but the

10   behavior had not changed.

11   Q    When you say the "behavior," Mr. Ferson, what are you

12   talking about?

13   A    Again, if a candidate's not in a room with a telephone

14   and a person on call time, they're not raising money.  So --

15   and they're not -- it's not just raising money.  You're

16   asking people to hold events where they're putting

17   fundraising events together.  None of that was happening

18   from my observation.

19   Q    Let's talk about campaign events.

20            Were there actually Das for Congress campaign

21   events that you attended?

22   A    I attended one.

23   Q    Where was that event?

24   A    It was at his hotel.

25   Q    Can you tell us how the turnout was and what happened?

1    A    It was early in my involvement in the campaign, and it

2    gave me hope.  I thought it was -- it was a good, what we

3    say, it was a "good room."  There were a lot of people

4    there.  I don't know the money raised, but from the number

5    of people who were there who were friends and family, it

6    looked like a good start.

7    Q    Were there other campaign events, either in

8    Massachusetts or outside the Commonwealth, that you knew

9    about?

10    A    Not that I recall.

11    Q    With the addition of Brennan Spencer and LA Harris, what

12    were you trying to accomplish with adding those two folks to

13    the Das for Congress team?

14    A    To find the -- fundraising is hard, and very few people

15    like to do it; and very few people are really good at it, so

16    you have to find the right fit for the candidate.  And we

17    try to take that in, I think, in a number of different ways

18    to make the fundraising successful.

19           I was convinced that the network was there, that

20    the money was there, if we could just figure out how to

21    unlock it from Beej making those calls.

22    Q    What was the issue, Mr. Ferson?  Was Mr. Das not making

23    the phone calls?

24    A    He was not making the phone calls, in my estimation.

25    Q    If he was not making the phone calls, what did you

1  observe him doing?

2  A    I didn't observe him doing much.  It was unclear where

3  he was.

4  Q    What do you mean by that?

5  A    I didn't -- I didn't see him.  The reports I got from

6  Brennan Spencer was that he wasn't --

7        MR. KENDALL:  Objection, your Honor, hearsay.

8        THE COURT:  Sustained.

9        MR. GALLAGHER:  I'll withdraw it.

10  Q    Now, you mentioned one of the other candidates in the

11  race was Dan Koh?

12  A    Yes.

13  Q    And you mentioned that Dan Koh was actually, in fact,

14  raising a lot of funds.  And as you were in the --

15  approaching the end of the first quarter of 2018, what

16  quarter is that?  What period of months is the first

17  quarter?

18  A    January, February, and March is the first quarter.

19  Q    So the last day of March is the end of the quarter?

20  A    Yes.

21  Q    And so what period of time do you report your

22  contributions for, the entire year or just that quarter?

23  A    No.  So it comes out by quarter.  It's public on the FEC

24  site by quarter, on the 15th after the closing.

25  Q    Is the campaign also required to, in addition to the

103

1    money they receive, report the money that they have spent?

2    A    Yes.

3    Q    How is that done, as far as you know?

4    A    "How" -- I'm sorry?

5    Q    How is that done?

6    A    It's with the filing with the FEC.  So when the report

7    comes out, you can see what's been brought in and what's

8    been spent.

9    Q    You mentioned something called a "burn rate."  Is that

10   something that the press, in your experience, look at as far

11   as the viability of a campaign?

12   A    They may, if you're burn rate is high.  If a campaign

13   were to hire a hundred staffers in the first quarter, for

14   instance, that's a very high burn rate.

15   Q    Now, did you exchange email with Molly Horan and Beej

16   Das about Dan Koh's numbers?

17   A    Yes.

18   Q    And I want to direct your attention to, in evidence,

19   Exhibit No. 3.

20        (Exhibit published to the jury.)

21        MR. GALLAGHER:  And if we could just blow up the

22   first part of the email where it says, "Poll done by Barbara

23   L'Italien."

24   A    Yes.

25   Q    Let's focus on that first.

1            First, who is Barbara L'Italien?

2     A    Barbara L'Italien was a candidate, but at the time was a

3     sitting state senator.

4     Q    Are these poll numbers?

5     A    These were her poll numbers.

6     Q    And so who is actually providing this data to the Das

7     for Congress campaign?

8     A    From the memo, it seems that the Mayor of Haverhill gave

9     them to Beej.

10    Q    And the Mayor of Haverhill being Mr. Jim --

11    A    -- Fiorentini.

12    Q    Fiorentini, okay.

13            And you wrote, "I find the Lori and Rufus numbers

14    to be suspect but not the rest," in your email you write

15    at --

16            MR. GALLAGHER:  If you would please highlight what

17    Mr. Ferson said at 12:29 a.m.

18    Q    And here, Mr. Ferson, you say that, "I find the Lori and

19    Rufus numbers to be suspect but not the rest."

20            What did you mean by that?

21    A    I believe that they were both advertising, and so when I

22    look at them, I don't think I would believe that they were

23    too high.  So I'm thinking that they were too low because

24    they were advertising and that they would have been higher.

25            And Dan Koh would have been advertising as well.

1          So, you know, the suspect is when you look at a

2    poll, did the numbers add up to 100.  Is the person who is

3    putting the poll out, is that an inflated number or not?

4    Q   So in this case the person actually putting the poll

5    numbers out are Barbara L'Italien, the same person who is

6    ahead in the poll?

7    A   Yes.

8          Which frankly wouldn't have surprised me, as she

9    was the sitting senator that represented the Third District.

10         MR. GALLAGHER:  Can you then pull up Mr. Das'

11   response at 12:32 a.m.

12   Q   And when he says here, Mr. Ferson, "Let's chat budgets

13   with Sean soon," do you know which Sean he's referring to?

14   A   I believe it's Sean Sinclair.

15   Q   Do you know also know a person by the name Sean Smith?

16   A   No.

17   Q   Do you know who the treasurer was for the Das for

18   Congress campaign?

19   A   No.

20   Q   When he says next, "This quarter's fundraising has us

21   all a bit rattled.  I can self-fund more, but will then need

22   to focus on my business to ensure funds will be available,"

23   what did you understand that to mean?

24   A   I took that to mean that I'm -- you know, one, in terms

25   of the need to raise money, money is not being raised.

1          Mr. Das, when things weren't working with a

2     particular person, would want to switch to another person,

3     try something else.

4          All of which I'm in favor of.  Try anything until

5     we find something that works.

6          And Sean Sinclair, having worked on a lot of

7     campaigns and put budgets together, has a wide national

8     network of people.  It may have been that we were going to

9     say, you know, What should we do from here?

10    Q   When he says here that he can self-fund more, what did

11    you take that to mean?

12    A   It would mean whatever number we were reporting the next

13    day was going to be anemic.  I don't remember what the

14    number was, but that led me to believe that there was still

15    a check he could write, as he did in the first reporting

16    period.

17    Q   When he said that he was going to self-fund, whose funds

18    did you believe that to be?

19    A   Himself.

20    Q   Did he ever tell you that the funds -- that part of the

21    funds he was getting included funds from his family, his

22    parents?

23    A   No.

24    Q   Did he say to you that he put in funds from other folks

25    who had contributed money to the campaign, like Jay Shah.

1          MR. KENDALL:  Objection, your Honor, leading.

2          THE COURT:  Well, it's sufficient leading.  Go

3    ahead.

4    Q    Did he ever tell you that other folks had given him

5    money for him to loan for -- so he could loan the money to

6    the campaign?

7    A    No.

8    Q    If he had told you that, would that have concerned you

9    at all?

10   A    I remember he specifically didn't because that would

11   have concerned me.

12   Q    Why?

13   A    I believe that not to be legal.

14   Q    Are you a lawyer, Mr. Ferson?

15   A    I am not a lawyer.

16   Q    Why do you think that that's not legal?

17         MR. KENDALL:  Objection.

18         THE COURT:  Sustained.

19         MR. GALLAGHER:  I'll move on, your Honor.

20         MR. KENDALL:  And I move to strike the answer.

21         THE COURT:  The objection is sustained, so there is

22   nothing to strike.

23         MR. KENDALL:  The one before, his opinion of what

24   was legal or not, your Honor.

25         THE COURT:  No.  I will let that stand.  Too late.

1    Q    In addition to -- let me go to the next exhibit,

2    Mr. Ferson.

3              MR. GALLAGHER:  Can you pull up Exhibit 4, please,

4    that is in evidence.

5          (Exhibit published to the jury.)

6    Q    And I want to draw your attention, first, your email at

7    10:40 a.m. on April 9, 2018 where you say, "Beej has spent

8    his career..."

9              Now, Mr. Ferson, can you just read to us what you

10   wrote on April 9, 2018, at 10:40 a.m.?

11   A    Sure.  "Beej has spent his career building a very

12   successful business.  He got into this race knowing that he

13   would be able to raise the money needed.  We're on track to

14   do that.  We have a clear idea of how much money will be

15   needed to reach voters and get our winning message across."

16   Q    Are you writing that email to anybody in particular?

17   What are you doing there, Mr. Ferson?

18   A    It seems from this that we're getting requests to

19   release the money -- to release the number to the press and

20   that we're not going to do that but would want to provide a

21   statement, and that would be the statement.

22   Q    Was that your job, to take that on, the messaging for

23   the campaign?

24   A    Yes, with Molly.

25   Q    I'm sorry, did you --

1    A    In consult with Molly.

2    Q    Molly worked for you, right?

3    A    Yes.

4    Q    If we can go to Mr. Das' response at 1:08 p.m. on the

5    same day.

6         And when Mr. Das says, "Thanks, all.  We are

7    sitting or nearly 80K.  With in-kinds and last minute checks

8    that are coming in from last quarter, we could hit mid-90s.

9    Will confirm this eve."

10        Mr. Ferson, what did you understand Mr. Das'

11   statement to mean?

12        MR. KENDALL:  Objection, your Honor.

13        THE COURT:  Sustained.

14   Q    When Mr. Das said, "We are sitting on nearly 80K," what

15   did you understand that statement to mean?

16        MR. KENDALL:  Objection, your Honor.

17        THE COURT:  Not what he meant but what you

18   understood it to mean.

19        MR. GALLAGHER:  Yes.

20   Q    Your understanding, Mr. Ferson.  What did you understand

21   that to mean?

22   A    So I understood it to mean that that's what Beej was

23   telling me.  But I did not understand that to be a number

24   until I saw it reported.

25   Q    As far as reporting goes, does it do any good -- the

1    campaign any good if the money is not in the bank account?

2    A    No.

3    Q    Why is that?

4    A    Because that's what reported.

5    Q    Is there a difference between commitments and actual

6    contributions?

7    A    You can't put commitments in the bank.

8    Q    What do you mean by that?

9    A    If someone says, I have a commitment for $100,000, but

10   the actual cash that shows up in a bank account that's

11   reported to the FEC is $50,000, it's not $100,000.

12   Q    So what has to be reported, the commitments or the

13   contributions?

14   A    The contributions.

15   Q    Do you know what an in-kind contribution is?

16   A    So an in-kind contribution would be if I host a

17   fundraiser for you at my house and I buy the beer and wine.

18   That's a contribution to the campaign that would be reported

19   not as cash but in-kind.

20   Q    Were you aware of in-kind contributions that the Das for

21   Congress campaign received?

22   A    No.

23   Q    Do you know what Mr. Das is referring to with these

24   in-kind contributions?

25   A    To be honest, I didn't put much stock in the email.  So

```
1    I didn't think anything of it.
2              MR. GALLAGHER:  We can take this off the screen
3    now.
4    Q   Now, you talked about different people that you helped
5    into the campaign, Brennan Spencer, LA Harris.  Were there
6    any other type of national-level consultants that were added
7    to the Das for Congress campaign in April or May of 2018?
8    A   Not that I remember.  He had national consultants when
9    we were brought on the campaign, a media firm.
10   Q   Do you remember who those folks were?
11   A   I'm not remembering the names, but nationally recognized
12   media.
13   Q   What do you mean by that, "nationally recognized media"?
14   A   That had worked on successful campaigns nationally.
15   Q   Do you know a person by the name of Jay Shah?
16   A   I do.
17   Q   Who is Jay Shah?
18   A   I know him as somebody who owned a house we visited
19   once.
20   Q   Was there some type of meeting related to the campaign
21   at his house later in 2018?
22   A   Yes.
23   Q   How did that take place?  What led to this meeting?
24   A   Campaigns, if they are not raising money or have other
25   problems, you know, come to a point of, you know, sort of
```

```
1    reckoning, if you will, and I think we were at that point.
2            So the senior person I was dealing with on the
3    campaign who had done campaigns before, Toby Chaudhuri, also
4    seemed to recognize that.  So it was -- tried to pull a
5    senior-level strategy meeting together of anybody who was at
6    that level in the campaign to see if we could right the
7    ship.
8    Q    You said this meeting took place at a certain house.
9    Where was that?
10   A    On the eastern shore in Maryland.
11   Q    Who was there?
12   A    The media consultants.  There's three partners, two of
13   them were there.  Jay was there, as it was his house as I
14   understood it.  I asked -- Mr. Das had asked, or both had
15   asked, Sean Sinclair to come down.
16           This was to try to get some people in who, you
17   know, are smart and more senior level who could try to right
18   the campaign.  So he came down.
19   Q    What happened during the first night?
20   A    I'm sorry?
21   Q    What happened the first night you were there?
22   A    It was social.
23   Q    You stayed the night?
24   A    Yes.
25   Q    And the next day what happened?
```

1    A    It was eventually a meeting in the early afternoon that

2    I thought was productive in having Mr. Das understand what

3    he needed to do on his personal effort to get the campaign

4    to where it needed to be.

5    Q    What was that?  What message did you and the others

6    communicate to Mr. Das that you think he understood?

7    A    That he needs to raise the money to be a viable

8    candidate.

9    Q    During that meeting with those folks did he say anything

10   about using any money from the campaign to pay hotel bills

11   or expenses related to his business?

12   A    No, not that I remember.

13   Q    What happened after this meeting?

14   A    I -- the meeting may have gone on after I left.  I left

15   to see my son in Washington.  And we then scheduled a

16   follow-up to that meeting with -- for a meet with Beej, with

17   Mr. Das, and Mr. Chaudhuri.

18   Q    Before we get there, I want to show you Exhibit 5, which

19   is in evidence.

20          MR. GALLAGHER:  And can you just pull up the first

21   part here down to the signature "regards, Beej."

22        (Exhibit published to the jury.)

23          MR. GALLAGHER:  Thank you.

24   Q    Could you tell us, Mr. Ferson, is this email related to

25   the meeting we just talked about?

1    A    Yes.

2    Q    The location here at "Walnut Point Farm," what is that?

3    A    That's the house.

4    Q    Okay.  And when Mr. Das says, "The chair of our

5    financial committee, Jay Shah, CEO of Hersha Hospitality

6    Trust," do you know who that is?

7    A    No.  I had not met him before this.

8    Q    When you did meet him, how did you know him?  What did

9    you meet him as?

10   A    As the chair.  I mean every campaign -- I felt this to

11   be positive, right, we need a robust finance committee of

12   high-worth people to -- they're there to help you raise --

13   identify where to raise the money from.

14          MR. GALLAGHER:  You can take this off, please, and

15   let me show you Exhibit 160.

16          (Exhibit published to the jury.)

17   Q    Do you recognize this, Mr. Ferson?

18   A    I believe so.

19          MR. GALLAGHER:  Go to the next page, please.

20   Q    What do you recognize this to be?

21   A    This is a different time of year, but I believe that's

22   the house.

23          MR. GALLAGHER:  You can take that off, please.

24   Q    So after this meeting, what was your impression about

25   the direction of the campaign after leaving this meeting?

1          MR. KENDALL:  Objection.

2          MR. GALLAGHER:  I'll rephrase, your Honor.

3    Q    What happened after this meeting?

4    A    I felt good leaving the meeting, that, you know, this

5    was my first glimpse into his finance committee.  It looked

6    good to me.  I don't have -- I don't know any of the names

7    on the finance committee, but having a finance committee is

8    a good idea.  And if we could get the candidate to be

9    disciplined about what they needed to do, then we could get

10   the campaign back on track.

11   Q    You mentioned that you then had a meeting with Mr. Das,

12   Mr. Chaudhuri at the hotel, the Stonehedge Hotel?

13   A    Yes.

14   Q    Tell us what happened during that meeting.

15   A    I went there again hopeful that we would have a

16   conversation.  There were other issues to the campaign,

17   relationship with the campaign manager, et cetera, and some

18   other things that -- but Job 1 is getting the fundraising in

19   place.  And I felt we were going to have a meeting about how

20   to proceed forward with that.

21          At this point I think Toby -- Mr. Chaudhuri played

22   a very critical role on the campaign because of his

23   relationship with the candidate.  So I felt good that the

24   both of them were going to be there.

25          But at the end what happened in the meeting made me

1      decide that we were no longer a fit with the campaign.

2      Q    So after that meeting, Mr. Ferson, did you, exit, you

3      and your company, exit the campaign?

4      A    Yes.

5      Q    And I would like to ask you, Mr. Ferson, the statement

6      of work, how much were you charging the Das for Congress

7      campaign for your service?

8      A    It was $10,000 a month.

9      Q    How did you come up with that number, $10,000 a month?

10     A    It's what I've charged other campaigns.

11     Q    Was that negotiated with Mr. Das?

12     A    Negotiated in that I said that that's what I charge.

13     Q    Okay.

14              MR. GALLAGHER:  If I could have a second, your

15     Honor.

16          (Pause in proceedings.)

17              MR. GALLAGHER:  I have nothing further, your Honor.

18              THE COURT:  Mr. Kendall.

19              MR. KENDALL:  Thank you, your Honor.

20                         **CROSS-EXAMINATION**

21     **BY MR. KENDALL**

22     Q    Good afternoon, Mr. Ferson.

23     A    Good afternoon.

24     Q    We never net.  My name is Mike Kendall.  Is that

25     correct, we've never met?

1    A    I don't believe so.

2    Q    You met with the government though several times,

3    haven't you?

4    A    Yes.

5    Q    I have FBI reports showing interviews in 2020 and 2021.

6    Do you remember both those interviews?

7    A    I believe I do, yes.

8    Q    The first and second we can just say.

9    A    Yes.

10   Q    And since then how many other meetings have you had with

11   the government?

12   A    Two.

13   Q    When were they?

14   A    They were recent.

15   Q    Roughly how long did each of these four meetings go?

16   A    An hour.

17   Q    Now, when you were testifying with Mr. Gallagher's

18   questions, you were discussing how you explained to Mr. Das

19   the importance of how much money you raise.  Do you remember

20   that testimony?

21   A    Yes.

22   Q    It would be fair to say that's one of the most obvious

23   things you talk about with a candidate, how much money you

24   have to raise, correct?

25   A    Correct.

1    Q    And you explained it's a barometer of whether people

2    take you seriously even if it's not a fair judgment,

3    correct?

4    A    Correct.

5    Q    Now, if I were -- but then he also asked you, sometimes

6    in the same questions about fundraising, did you discuss

7    cash on hand with Mr. Das.  Do you remember him asking you

8    that?  I think he might have even put the two phrases

9    together.

10    A    Yes.

11    Q    If I were to suggest to you in your prior interviews

12    with the government you never said you discussed cash on

13    hand, you only discussed fundraising with Mr. Das, would you

14    agree with me?

15    A    I don't know that I would agree with you.

16    Q    Is it your testimony in your prior interviews in which

17    the FBI agent wrote down notes that you told the government

18    that you had actually discussed cash on hand with Mr. Das?

19    A    I think I was referring to a document where it mentions

20    "cash on hand."

21    Q    There is the press release, so let's put that aside.

22         But in general it would be fair to say you have no

23    memory of ever discussing with Mr. Das the concept of cash

24    on hand with that particular phrase?

25         MR. GALLAGHER:  Objection, vague.

```
1              THE COURT:  I'm not sure I quite --

2              MR. KENDALL:  Okay.

3    Q   My point being, do you agree that you don't have a

4    specific memory that you actually discussed the concept of

5    cash on hand with Mr. Das other than this press release

6    we'll put off for a moment?

7    A   No.  We -- we -- just by the nature of it being a

8    campaign, you -- cash on hand is always a number.

9    Q   So would you agree with me that you didn't tell that to

10   the FBI in the two interviews they memorialized in their 302

11   reports, correct?

12   A   I don't remember that.

13   Q   So you have no memory of telling them in the prior

14   interviews?  Today you're bringing it up, correct?

15             MR. GALLAGHER:  Objection, vague.

16             THE COURT:  Sustained.

17   Q   That press release --

18             MR. KENDALL:  Was that Exhibit 2?  I think it was.

19        Could we have Exhibit 2 on the screen, please?

20   A   Yes.

21   Q   Exhibit 2, the press release.

22             Now, we know for the end of Q4 he had raised

23   $425,000 approximately, about 280 in loans and about 150 in

24   donations, rough numbers?

25   A   Yes.
```

 1    Q     And this is issued 16 days after the end of the quarter.

 2          Now, this is drafted by your office, correct?

 3    A     Correct.

 4    Q     That $550,000 number was typed by somebody in your

 5    office, correct?

 6    A     Correct.

 7    Q     Do you know who did it?

 8    A     I'm assuming Molly Horan, who wrote the press release.

 9    Q     Now, if he raised 424 in Q4, we know there was nothing

10    before Q4 being raised because that's the start of his

11    campaign, correct?

12    A     No, I don't that to be true --

13    Q     Sure.  He made his announcement September 25, and he

14    started raising money after that.  This is his first -- Q4

15    is his first filing with the FEC, with the FEC 3 form, for

16    his money raised, correct?

17    A     Yes.

18    Q     So his first time out reporting he reports up through

19    December 31 he's raised 425.  Your office puts out a cash on

20    hand number in a press release of 550.  Do you agree with

21    me?

22    A     I'm reading it, yes.

23    Q     It's either they raised $125,000 in the first 16 days of

24    January or somebody from your office typed an incorrect

25    number for cash on hand, correct?

1    A    I don't know that it's an incorrect number.

2    Q    You think they raised 125 -- you just told us he wasn't

3    doing call time.  He wasn't doing a good job fundraising.

4    You think he raised $125,000 in 16 days?

5    A    I'm just telling you I don't know that.

6    Q    You don't know that.  And certainly nobody verified it,

7    correct?  That number just somehow ended up in a press

8    release.

9              MR. GALLAGHER:  Objection, argumentative.

10             THE COURT:  Sustained.

11   Q    You said it's your practice to run press releases by

12   your candidates, correct?

13   A    Yes.

14   Q    But you have no memory of ever discussing this with

15   Mr. Das?

16   A    No.  Other than to make sure that the information was

17   correct.

18   Q    Well, did you -- do you remember you had a conversation

19   with him, "Did you raise $125,000 in the last 16 days"?

20             MR. GALLAGHER:  Objection.  Asked and answered.

21             THE COURT:  Overruled.

22   A    I would have had the conversation with Molly Horan.

23   Q    You would have had.  You don't remember it.  You're

24   assuming you did.

25   A    That was from five years ago.

1    Q    I agree with you.  It's a long time ago.

2         So you don't have a specific memory.  You're

3    assuming you probably did, but you really don't know?

4    A    Well, that's my practice.

5    Q    That's your practice.  So you're agreeing with me.

6    You're assuming you did, but you really don't know?

7    A    Correct.

8    Q    And the same thing about your conversations with Mr. Das

9    and cash on hand.  You're assuming you did, but really can't

10   recall a specific conversation, can you?

11   A    So, to be clear --

12   Q    Just if you can answer my question, yes or no?  Can you

13   recall a specific conversation?

14   A    I can't recall, no.

15   Q    Thank you.

16        Now, I want to go back to your first meetings --

17   oh, the other thing is Mr. Gallagher asked you about in-kind

18   contributions.  Do you remember that?

19   A    Yes.

20   Q    You expressed a little skepticism?

21   A    Hm-hmm.

22   Q    In-kind contributions can come from the candidate,

23   correct?

24   A    I don't know how that would work.

25   Q    Candidate uses his credit card or her credit card to pay

1    for various things for the campaign.  That's an in-kind

2    contribution from the candidate.

3    A    I'm not familiar enough with the rules to -- if that had

4    been raised, to say that.

5    Q    So you're not familiar with the FEC rule that discusses

6    candidates making these in-kind contributions --

7              MR. GALLAGHER:  Objection.

8    Q    -- is that what you're testifying?

9              MR. GALLAGHER:  Objection.

10             THE COURT:  You can't object before I hear the

11   question.  You may know what Mr. Kendall is going to ask,

12   but I've got to hear it first.

13        Let's try again.

14   Q    Are you aware that the FEC actually publishes rules

15   about in-kind contributions from candidates?

16   A    I'm sure they do.

17   Q    You're sure they do, but you haven't read it.

18   A    No.

19   Q    So when you're expressing skepticism about his

20   statements of in-kind contributions, are you assuming

21   that -- well, strike that.

22             You're expressing skepticism about in-kind

23   contributions.  You're assuming they're not contributions

24   from him?

25   A    My skepticism about in-kind --

1    Q    Excuse me.  Just answer my question.

2              MR. GALLAGHER:  Objection.

3    Q    You're assuming the contributions are not from him?

4              MR. GALLAGHER:  Your Honor, I object to Mr. Kendall

5    interrupting the witness when he's trying to answer.

6              THE COURT:  It's fair enough for him to ask for an

7    answer to his question.  The witness is doing his best.

8    Let's go on.

9    Q    Could you just tell me, yes or no, are you assuming

10   those contributions were not from the candidate?

11   A    Yeah, I am.  Yes.

12   Q    Thank you.

13             Now I want to go back to your initial meeting with

14   Mr. Das.

15             You met with him back sometime in the fall of 2017?

16   A    Correct.

17   Q    Now, you've worked with a lot of campaigns, just to

18   state the obvious, correct?

19   A    Yes.

20   Q    You worked with a lot of first-time candidates, correct?

21   A    Yes.

22   Q    Do you agree with me in terms of running a successful

23   political campaign experience matters?

24   A    Maybe.

25   Q    Isn't that why people hire you?

1    A    Well, it might be why people hire me, but there's lots

2    of successful campaigns run by people who don't have

3    experience.

4    Q    Are you telling us people don't need to hire consultants

5    with lengthy experience?

6    A    Maybe not.

7    Q    But lots of them do, correct?

8    A    Correct.

9    Q    And lots of people think that's a successful way to run

10   a campaign, correct?

11   A    Correct.

12   Q    And would you agree with me that most congressional

13   campaigns do hire consultants?

14   A    Yes.

15   Q    And they have consultants who specialize in various

16   things, correct?

17   A    Yes.

18   Q    You told us you were a press person.  Eric is the

19   fundraising person?

20   A    Hm-hmm.

21   Q    When Mr. Das and Mr. Chaudhuri visited you back in the

22   fall of 2017, one of the things you talked about was your

23   experience and skill in advising first-time candidates,

24   correct?

25   A    Probably, yes.

1    Q    And you cited the very impressive campaign of Seth

2    Moulton first time out is the type of things you could help

3    a candidate accomplish as a first-time candidate?

4    A    It's a fact that I had helped Seth Moulton, yes.

5    Q    It was a great campaign, correct?

6    A    It was.

7    Q    Don't be modest.

8         I mean it was very successful, very effective for a

9    first-time candidate, correct?

10   A    Correct.

11   Q    And one of the things you told them was you could

12   actually create the whole organizational structure for a

13   campaign, and you cited the Moulton one as an example you've

14   done for a first-time candidate.

15   A    Yes.

16   Q    And they hired you to be the general consultant,

17   correct?

18   A    Yes.

19   Q    Molly was doing -- Molly Horan was doing the press day

20   to day, correct?

21   A    Yes.

22   Q    About how much of her time was spent on the campaign?

23   A    I don't know.  Campaigns take time, so -- but I didn't.

24   We don't track it that way.

25   Q    And then Eric Chast was doing the fundraising?

```
 1   A   Yes.

 2   Q   And would you agree -- were you aware at the time that

 3   Eric had never done any fundraising as a finance directer on

 4   a federal campaign?

 5   A   He's a fundraiser.

 6   Q   As a finance director.

 7   A   I don't know that.

 8   Q   Are you aware that he had never done any FEC reporting

 9   before?

10   A   No.

11   Q   Of course you're aware he was doing that for the Das

12   campaign, correct?

13   A   I don't know that actually.

14   Q   You don't?

15   A   No.

16           MR. KENDALL:  Could we have G-26, please.

17       (Exhibit published to the jury.)

18   Q   So Eric worked on that campaign starting from mid

19   November to mid May about -- is that six months, if I

20   counted correctly?  Does that seem close to you?

21   A   That sounds right.

22   Q   And do you see where it --

23           MR. KENDALL:  Excuse me.  I'm going to have to look

24   over your screen.

25   Q   Do you see in the middle where he says, "Hey Beej, I do
```

1    these for you."

2            He's referring to the FEC reports.

3    A    I see that.

4    Q    Until you saw that memo, did you realize he was filing

5    the FEC reports for the Das campaign?

6    A    I didn't realize he was filing them.  I know they were

7    being filed.

8    Q    Did you realize he was completing them and submitting

9    them?

10   A    No.  He was in charge of fundraising.

11   Q    And so is he doing this as a side gig?

12   A    No.  The filing is part of the fundraising.  Someone has

13   to do it.

14   Q    Filing the FEC 3 reports are a part of his fundraising

15   responsibilities.  Are you aware that he had never done that

16   before in a federal campaign?

17   A    I don't know that -- what campaigns he worked on before

18   he -- I don't know specifically what campaigns he worked on

19   before he joined with me.

20   Q    So when you gave the Das campaign the pitch, We can set

21   up the first-time candidate and do everything for you, you

22   didn't realize that your fundraising person had never done

23   any of these responsibilities at the federal level before?

24   A    He was a fundraiser.

25   Q    Was he a fundraiser before for federal congressional

```
 1   campaigns?

 2   A    I don't know what campaigns he worked on.

 3   Q    You hired him.  You didn't know his background before

 4   you hired him?

 5   A    Well, I did at that time.

 6   Q    Well, he still works for you now, doesn't he?

 7   A    I don't look at his resume every day.

 8   Q    So when you were pitching him out to candidates, you

 9   didn't know what his capabilities were?  You were just in

10   sell mode?

11   A    That's incorrect.

12   Q    Well, you didn't know what his experience was at the

13   federal level, correct?

14   A    Correct.

15   Q    And this was a federal campaign.

16   A    (No response.)

17   Q    Did he ever -- did Mr. Chast ever come and ask you for

18   any guidance or help in doing his FEC work on the Das

19   campaign?

20   A    No.

21   Q    Did you ever make any attempt to supervise him in his

22   work?

23   A    We spent a lot of time on -- talking about call time.

24   Q    Did you talk to him about the FEC 3 filings and how that

25   was going, and was he in control of it, or did he need help?
```

1    A    FEC 3?

2    Q    Yes, the form.  It's called an FEC-3 form.

3    A    No.

4    Q    The quarterly forms.  You never discussed any of that

5    with him?

6    A    Just for the press release.

7    Q    So he was on his own for that; is that fair to say?

8    A    Well, working with whoever was on the finance team in

9    the fundraising.

10   Q    But nobody else from your department, nobody else from

11   Liberty Square, correct?

12   A    No, correct.

13        MR. KENDALL:  Could we have Exhibit I-770, and if

14   we could show that to the witness, and can we give a copy,

15   please, to the government.

16   Q    Do you recognize I-770?

17   A    I can't see it.

18        MR. GALLAGHER:  I can't see it, counsel.  Do you

19   have a copy?

20        MR. KENDALL:  I hope we do.

21    I'm happy to show you mine, but I need it back.

22   Q    Do you recognize this?

23   A    It appears to be from our website.

24   Q    It's from your website, correct.  And it describes the

25   services you provide in campaign management, correct?

```
1    A    Yes.
2              MR. KENDALL:  I would like to offer this into
3    evidence, your Honor, as our next exhibit.
4              THE COURT:  What would be the next number?
5              THE CLERK:  One hundred sixty-one.
6              MR. GALLAGHER:  No objection, your Honor.
7              (Defendant's Exhibit No. 161 received in evidence.)
8              A JUROR:  We don't see it.
9              THE CLERK:  You shouldn't until now.
10             THE COURT:  Generally, until I admit it, it won't
11   show on the screen.  So you can put it up now so the jurors
12   can see it.
13         (Exhibit published to the jury.)
14   Q    So this is on your website what you advertise to
15   prospective candidates, right?
16   A    Yes.
17   Q    And this is why they should hire Liberty Square Group,
18   correct?
19   A    One of the reasons.
20   Q    Excuse me?
21   A    One of the reasons.
22   Q    Okay.
23             If we go to the third category there, it says,
24   "Compliance.  Campaigns push candidates to the extremes of
25   physical and mental exhaustion."
```

1              That's a true statement, isn't it?

2    A    It is.

3    Q    "The only thing a candidate should worry about is how

4    many voters they've talked to in a day.  Liberty Square

5    Group will get your paperwork filed, set up your banking and

6    compliance, walk you through the dos and don'ts of campaign

7    finances, and file reports on your behalf."

8              That's what it says, correct?

9    A    Correct.

10   Q    And that's part of the services you told Mr. Das that

11   you would provide, correct?

12   A    I don't know that that's in our statement of work, but

13   that's on our website.

14   Q    And if Mr. Chast was doing the FEC filings even without

15   your knowledge, that's what he is supposed to be providing,

16   correct?

17   A    Well, Mr. Chast does filings.  He does them for

18   campaigns we have now for candidates.

19   Q    But I'm talking back six years ago.

20   A    Right.

21   Q    That's what he should have been doing back six years

22   ago?

23   A    Well, he was in charge of fundraising.

24   Q    Well, he's also filing FEC 3 forms, correct?

25   A    Which is a part of what he needs to do --

```
 1    Q    Part of fundraising --
 2    A    -- in his --
 3              MR. GALLAGHER:  I just want to object.  The witness
 4    is trying to finish his answer.
 5              MR. KENDALL:  I'm sorry, your Honor.
 6              THE COURT:  Yes, let the witness finish.
 7              MR. KENDALL:  I apologize for my manners.
 8    Q    Please go ahead and finish your answer.
 9    A    The filing is part of what you need to do when you're
10    raising money.
11    Q    Yes.  You have to have some compliance steps as part of
12    your filing, correct?
13    A    Yes.
14    Q    "Campaigns push candidates to the extremes of physical
15    and mental exhaustion."
16              You thought Mr. Das was too distracted from the
17    campaign by his businesses, correct?
18    A    I don't know what he was distracted by.
19    Q    Did you get a sense at some point that the businesses
20    were having issues?
21    A    My sense was I don't know anything about Mr. Das'
22    business.  It's not something I've ever been involved in.
23    But I'm not surprised that it's complicated and there's a
24    lot of moving parts.
25    Q    Would you agree with me if a person tries to run a
```

1    complicated business and run for Congress in a crowded field

2    at the same time, that's very demanding and pushing someone

3    to the extreme, correct?

4    A    It's demanding, yeah.

5    Q    As far as you're concerned, being a candidate for

6    congress should be a full-time job, correct?

7    A    Every candidate I have is -- has, you know, families.

8    It's a complicated life.  It's not always -- there's very

9    few people who are just laser-focused and only do

10   campaigning.

11   Q    But a lot of people in this room have lives and a

12   full-time job, correct?

13   A    Correct.

14   Q    But running for Congress, it's not something you should

15   do as a part-time job.  It's a full-time commitment?

16   A    As I mentioned, the fundraising is a full-time job when

17   you're a new candidate.

18   Q    Now, when you were having this meeting with Mr. Das and

19   Mr. Chaudhuri, you had the impression that Mr. Chaudhuri was

20   his principal adviser, correct?

21   A    Yes.

22   Q    And did you notice in the meeting that Mr. Das would

23   look to him and sort of defer to his judgment or wait to

24   hear his comments?

25   A    I don't know if I remember that.  I remember they had a

1    very easy working relationship.

2    Q    And you viewed him as his chief adviser, his principal

3    adviser, correct?

4    A    Yes.

5    Q    His closest confidant?

6    A    Yes.

7    Q    And Mr. Chaudhuri would travel to Massachusetts

8    frequently from D.C.?

9    A    Yes, that's my understanding.

10    Q    When you thought the campaign was disfunctional and

11    wanted to implement change, you went to Mr. Chaudhuri hoping

12    he would have Mr. Das' ear?

13    A    Yes.

14    Q    Would you agree with me Mr. Chaudhuri was actually

15    actively involved in trying to get the fundraising going?

16    A    I don't know that.

17            MR. KENDALL:  Can we take a look at I-133.

18        And this is -- the government produced the document,

19    your Honor.

20    Q    Is this an email that you exchanged with Mr. Chaudhuri?

21    A    It says "from Toby," but it says, Hi, Scott -- no, I get

22    it.  Sorry.

23    Q    From Toby to you, correct?

24    A    Yes.

25            MR. KENDALL:  Your Honor, I would like to mark that

1    as the next exhibit, please.

2              MR. GALLAGHER:  No objection.

3              **(Defendant's Exhibit No. 162 received in evidence.)**

4              MR. KENDALL:  Can we show it to the jury, please.

5         (Exhibit published to the jury.)

6    Q    If you can see that, it's December 13, 2017.  So that's

7    in the middle -- this is the middle of December in Q4, the

8    last month of Q4, correct?

9    A    Yes.

10   Q    And Chaudhuri is writing to you, "We need to drastically

11   ramp-up our fundraising machine," correct?

12   A    Yes.

13   Q    And he raises to you call-time, fundraising tactics, and

14   other things they need to be doing.

15   A    Yes.

16   Q    Would you agree with me Mr. Chaudhuri seemed to be

17   involved in many of the important issues in the campaign,

18   correct?

19   A    He, from my observation, was, yes.

20   Q    Staffing?

21   A    (No response.)

22   Q    Hiring the campaign manager?

23   A    Again, Mr. Das came with a campaign manager, so I don't

24   know about that.

25   Q    So you didn't see that when it happened.

1          Certainly fundraising he was involved in, the

2    liaison to the Indian community around the United States.

3    A    It's my understanding -- I don't know how hands-on that

4    was or if it was a higher level, you know, but certainly

5    interested in it.

6    Q    And you discussed fundraising goals with Mr. Chaudhuri,

7    correct?

8    A    Well, we were all clear about what we felt the target

9    number had to be, yes.

10   Q    You, based upon your experience in trying to be, you

11   know, pretty objective about it, thought 1.5 to 1.7 was sort

12   of the range you had to come in at to have a chance at

13   winning the campaign?

14   A    Yes.

15   Q    In fact, the numbers were much higher in this campaign,

16   weren't they?

17   A    Right, but those don't always translate into a winning

18   campaign.

19   Q    But in this case, number one and two both had much

20   higher numbers, correct?

21   A    I was focused on Mr. Koh's money because he was leading

22   the charge.  I don't know what Congresswoman Trahan was.

23   Q    Let's talk about the race for a little bit.

24          If we want to put aside political views and

25   political policy issues, if we just look at politics like a

```
1    sport, this was a great race, wasn't it?

2    A   I'm not sure what you mean by that.

3    Q   You had Daniel Koh, who was a closely allied with the

4    mayor of Boston and his former chief of staff, a bright,

5    politically experienced guy, who raised over $3 million,

6    correct?

7              MR. GALLAGHER:  Objection.  Relevance.

8              THE COURT:  Sustained.

9    Q   The point I want to make is, there were a lot of people

10   there with a lot more opportunities to have a chance of

11   winning than Mr. Das, correct?

12   A   I'm -- I don't know what you're -- I don't know what you

13   mean by that.

14   Q   Mr. Koh, he had the backing of the mayor of Boston,

15   correct?

16             MR. GALLAGHER:  Objection.  Relevance.

17             THE COURT:  Sustained.

18   Q   A lot of the candidates in that race had more political

19   experience, better networks to raise money, better

20   connections in labor unions and political organizations than

21   Mr. Das, correct?

22             MR. GALLAGHER:  Objection.

23             THE COURT:  I'll allow that one.

24   A   I don't know that to be true.

25   Q   Well, you certainly know that's true of Dan Koh.
```

```
 1    A    No, I don't.

 2    Q    Dan Koh raised over $3 million, didn't he?

 3    A    That's a fact.

 4              Mr. Das on paper looks as impressive as Dan Koh to

 5    me.

 6    Q    Dan Koh had the support of the mayor of Boston?

 7              MR. GALLAGHER:  Objection.

 8              THE COURT:  Yeah.  I don't see what this has to do

 9    with this case.

10              MR. KENDALL:  Your Honor, if I may have a few

11    questions.  It's actually an important issue for us.

12              THE COURT:  Can we get to the point?

13              MR. KENDALL:  Okay.

14    Q    The point I want to make is it was pretty clear that

15    Mr. Das didn't have a chance in this campaign because he

16    wasn't raising money and other people were raising lots of

17    money and had lots of political support.

18    A    I don't believe that to be true.

19    Q    So you don't believe that the support of the mayor of

20    Boston --

21              MR. GALLAGHER:  Objection.

22              THE COURT:  Sustained.

23    Q    So even though people were raising 3, 4 million dollars,

24    getting labor unions and established political figures to

25    throw their support behind them, you think that really
```

 1   didn't make much of a difference.

 2              MR. GALLAGHER:  Objection.  Asked and answered.

 3              THE COURT:  I think the point is that the campaign

 4   just didn't do very well.

 5   Q   The campaign didn't do very well in very strong

 6   competition.

 7   A   I don't agree with that.

 8   Q   You don't think that Dan Koh was strong competition with

 9   over $3 million and labor unions?

10   A   I have a long history of working on campaigns.  Seth

11   Moulton was 56 points behind John Tierney who had every

12   institutional player in his corner.  So I don't think at the

13   start that Mr. Das was at a disadvantage in that raise.

14   Q   But would you agree with me if someone had raised

15   millions of dollars and had established political

16   organizations behind them, it's very helpful?

17   A   No, I don't agree with that.

18   Q   Okay --

19   A   Dan Koh lost.

20   Q   Dan Koh lost by 145 votes?

21   A   Right.

22   Q   Lori Trahan had worked for the prior Congressman Marty

23   Meehan for years and had a great political network, right?

24              MR. GALLAGHER:  Objection to this line of

25   questioning.

1          THE COURT:  Yes, we are getting off.

2   Q    The point being -- in April there was a debate, I think

3   sponsored at the University of Lowell, and Mr. Das was not

4   allowed to participate in the main debate.  Do you remember

5   that?

6   A    When was this?

7   Q    In April.

8   A    I do remember that, yes.

9   Q    What happened was they divided the candidates into two

10  tiers, those that either had done high in polls or had some

11  other criteria could go to the main debate, that's like five

12  or six, and the rest were not allowed to participate,

13  correct?

14  A    I don't remember the split, but, yes.

15  Q    And this came out shortly after the poll from Barbara

16  L'Italien that Mr. Gallagher asked you about.  That was in

17  March.  This was in April, correct?

18  A    Yes.

19  Q    And everybody who didn't -- Mr. Das was one of the

20  people that didn't make the main debate, correct?

21  A    Correct.

22  Q    And the sort of phrase people used for those that were

23  put in the second group, not the first, was, They were sent

24  to the kiddie's table.  Do you remember that?

25  A    I don't remember who said that.

```
 1    Q    But do you remember that was a phrase used, the

 2    "kiddie's table"?

 3    A    Perhaps.

 4    Q    And it meant that people weren't taking their campaigns

 5    very seriously, correct?

 6    A    Yes.  That is correct.

 7    Q    And it would be fair to say that to be put in the

 8    kiddie's table in the campaign is a tremendous impediment to

 9    overcome?

10    A    I would agree with you on that it was not a very well

11    run campaign.  That's different.

12    Q    Yeah.

13         So if you've got a poorly run campaign and it's

14    recognized and it's accurately classified as belonging at

15    the kiddie's table, it is a campaign that looks like it's

16    not going to win, correct?

17    A    Unless it raises money very quickly.

18    Q    But you just told us that money isn't everything, that

19    Dan Koh's money wasn't everything and Lori Trahan's money

20    wasn't everything.

21    A    You don't need $3 million.  You do need 1.5 to 1.7

22    million dollars.  I firmly believe that.  And I've run

23    campaigns --

24    Q    Sure.

25    A    -- where they've raised that money and have won.
```

1    Q    And if he could have raised that, he might have had a

2    chance, is what you're saying?

3    A    Yes.

4    Q    But instead he didn't raise it, and by March or April he

5    was publicly recognized as being at the a kiddie's table,

6    correct?

7    A    Yes.

8            MR. KENDALL:  Your Honor, if I may have one moment

9    to confer, please?

10            THE COURT:  You may, of course.

11        (Pause in proceedings.)

12            MR. KENDALL:  Your Honor, I just need to check my

13    notes, and I'll be done in a moment.

14        (Pause in proceedings.)

15    Q    You know, what happened was you ended work in the

16    campaign in May; is that correct?

17    A    I believe so.

18    Q    You had a conversation with Mr. Das and Mr. Chaudhuri

19    where they told you they loved Molly Horan, they thought she

20    did great work, but they were unhappy with Eric Chast as the

21    fundraiser, correct?

22    A    I don't remember that specifically.

23    Q    And they told you they wanted to cut your fee from

24    10,000 to a smaller amount and use Molly Horan but not use

25    Eric Chast, correct?

1    A   I don't remember that at all.

2    Q   And in mid May, that's when your relationship -- working

3    in the campaign ended, correct?

4    A   It ended in whatever -- yeah, mid May or whatever day.

5           But not after that conversation.  I don't remember

6    that conversation.

7    Q   It ended on May 18, May 19, wasn't that the -- May 18

8    was the meeting at the Stonehedge, and then the next day the

9    relationship was formally ended?

10   A   If that's what you're saying.

11        (Pause in proceedings.)

12        MR. KENDALL:  That's all I have for the moment,

13   your Honor.  Thank you.

14        THE COURT:  Any need for redirect, Mr. Gallagher?

15        MR. GALLAGHER:  Just a couple, your Honor.

16                   **REDIRECT EXAMINATION**

17   **BY MR. GALLAGHER**

18   Q   Mr. Ferson, did you leave the campaign, or did Mr. Das

19   fire you from the campaign?

20   A   I left the campaign.

21   Q   For what reason?

22   A   I've worked on dysfunctional campaigns before.  I worked

23   on dysfunctional campaigns up to election day before.  I

24   thought we had had a good meeting in Maryland.  The meeting

25   is Stonehedge was not a good meeting.  They, in fact,

1    mimmicked the campaign manager.

2    Q    You didn't like that?

3    A    I didn't like that.

4    Q    Based upon that you left?

5    A    Based upon that.

6         We had had a drink.  I thought it was going to be a

7    nice meeting, and I threw down a $20 bill and left the

8    hotel.

9    Q    You asked -- Mr. Kendall asked you about fundraising

10   versus compliance.  Do you recall those questions?

11   A    (Witness nods.)

12   Q    Can you explain to the jury what the difference is.

13   A    So when you're the general consultant and you're hired

14   to do different things, there's a lot of components in

15   communications.  I'm very familiar with all those

16   components, dealing with the press, putting out press

17   releases, messaging, all of that.

18        Fundraising, in a category and a proposal like that

19   also, encompasses a lot of things, a lot of which are done

20   by the person who's the fundraiser, and others that are done

21   by professionals who do that.

22   Q    In your prior campaigns you had worked on, have there

23   been treasurers involved in the campaign?

24   A    Yes.  You have to, yes.

25   Q    Why is it that you have to have a treasurer?

1    A    It's the first thing -- the first thing you do to set up

2    a campaign committee.  You have to have a treasurer.

3    Q    And typically what does a treasurer do?

4    A    A treasurer is responsible for the veracity of the

5    filings.

6    Q    Do you know whether or not the Das for Congress campaign

7    actually had a treasurer?

8    A    I think -- it was my assumption that you have to, that

9    it did, yes.

10   Q    Did you ever talk to that person?

11   A    No.

12   Q    When making phones calls, in your experience,

13   Mr. Ferson, who is the person who is the best person to make

14   the phone calls to solicit contributions?

15   A    The candidate.

16   Q    Why is that?

17   A    Because you're writing a check, a very large check, to

18   the candidate.  You want to talk to the candidate.

19              MR. GALLAGHER:  That's all I have, your Honor.

20              THE COURT:  Anything, Mr. Kendall?

21              MR. KENDALL:  A little bit, your Honor.

22              THE COURT:  All right.

23                     **RECROSS-EXAMINATION**

24   **BY MR. KENDALL**

25   Q    You're familiar with the role of a treasurer in a

1    campaign, correct?

2    A    I'm not familiar with the role of a treasurer other than

3    you need one.

4    Q    So you're familiar that the role exists --

5    A    Yes.

6    Q    -- correct?

7    A    Correct.

8    Q    Are you familiar with what's the qualifications to be a

9    treasurer?

10    A    No.

11    Q    If I were to suggest to you there are no qualifications,

12    anybody could be a treasurer, would you agree?

13    A    I would agree that based on my experience I wouldn't --

14    that sounds right.

15    Q    Would you also agree that it's a common practice,

16    endorsed on the FEC website, that the treasurer doesn't have

17    to have any political experience at all, they just hire a

18    professional staff to help them?

19    A    It often doesn't.

20    Q    Excuse me?

21    A    Often doesn't have political experience.

22    Q    And they hire someone to support them in that, correct?

23    A    It might be a CPA, right.

24    Q    Or it might be Eric Chast?

25    A    I don't know if he's ever been.

1    Q    He certainly sent an email to Mr. Das saying, "I do this

2    for you," correct?

3              MR. GALLAGHER:  Objection.  Misleading.

4              THE COURT:  Well, it's not misleading.  It's

5    outside the scope of the redirect.

6              MR. KENDALL:  No further questions, your Honor.

7              THE COURT:  Thank you very much, Mr. Ferson, for

8    your testimony.

9              THE WITNESS:  Thank you.

10        (Witness excused.)

11              THE COURT:  Jurors, I fully intend to have you out

12    by four.  Does anyone need a break now?  Can we make it to

13    four o'clock?  Are you comfortable?

14        (Jurors nod affirmatively.)

15              THE COURT:  Okay.  Next witness then.

16              MS. WAN:  Your Honor, the government calls Eric

17    Chast.

18        (Pause in proceedings.)

19              THE CLERK:  Please raise your right hand.

20                        **ERIC CHAST, sworn**

21              THE CLERK:  Thank you.

22        Please be seated.

23        Could you please introduce yourself, spelling your last

24    name for the record?

25              THE WITNESS:  My name is Eric Chast.  "Chast" is

1    spelled, C-H-A-S-T?

2                        **DIRECT EXAMINATION**

3    **BY MS. WAN**

4    Q    Good afternoon, Mr. Chast.

5             What do you do for work?

6    A    I'm the chief operating officer at Liberty Square Group.

7    Q    Will you briefly describe your educational background.

8    A    Sure.  I have a communications and history degree from

9    Appalachian State University, and then I have a masters in

10   business administration from Hult International Business

11   School.

12   Q    How long have you worked at Liberty Square Group?

13   A    I started around October 2016.

14   Q    So that's about seven years?

15   A    Yes.

16   Q    And tell us about the types of work that you did before

17   joining Liberty Square Group.

18   A    I started working on campaigns before I graduated from

19   my undergrad, working in field.  It's like knocking on

20   doors, making phone calls to potential voters.  I did that

21   for a presidential campaign.

22             I worked in field for a few more years on different

23   campaigns in West Virginia and Virginia and made it up to

24   Boston, where I did fundraising briefly before going into

25   the payroll department and doing more administrative work

1    for a company called Grassroots Campaigns.

2              From there, I joined the Connolly -- John

3    Connolly's mayoral campaign.  I joined that as his finance

4    director in charge of fundraising.

5              And from there I worked on a few more campaigns,

6    and then got to a nonprofit, educational nonprofit, for a

7    year before going back to school.

8    Q    And before you joined Liberty Square Group, had you ever

9    worked on any federal campaigns?

10   A    I mean, except for the field campaign, my first job, I

11   was an intern, nothing real, no.

12   Q    Had you worked on state campaigns?

13   A    Yes.

14   Q    And at Liberty Square Group, what different positions

15   did you hold?

16   A    I joined as voice president of fundraising and

17   investment, which is the nonprofit term for fundraising.

18             And then in 2018, when our CEO left, I became the

19   business manager, and we quickly changed that title to

20   "COO."

21   Q    What types of services did you provide as the directer

22   of fundraising?

23   A    Fundraising.  So for political campaigns I would teach

24   the candidates how to fundraise, how to organize and make

25   their networks as impactful as possible for the campaign.

1    Q    At Liberty Square Group did you work on both state and

2    federal campaigns?

3    A    It wouldn't have been until -- I worked for Niki Tsongas

4    for four days until she decided she was going to retire.  So

5    I didn't really do anything for her.  And then it would have

6    been Beej's campaign after that.

7    Q    Now, you mentioned Mr. Das's campaign.  Tell us about

8    the race that Mr. Das was running for.

9    A    This is the Third Congressional District, so like the

10   Congressperson that traditionally is from Lowell.

11   Q    How did you first meet Mr. Das and learn that he was

12   interested in running for that office?

13   A    We interviewed several candidates from -- that were in

14   that race, and he was one of them that came into our office.

15   Q    What do you remember about that meeting when Mr. Das

16   came into your office?

17   A    He seemed like the most organized of all the candidates.

18   No one else really came with -- with really -- more than a

19   staffer.  But he was flanked by his campaign chair on one

20   side and his campaign manager on the other.

21   Q    What if anything did Mr. Das tell you about his

22   fundraising at that point?

23   A    He had said he had raised about $50,000 at that point.

24   Q    And later on -- and exactly when was this meeting, if

25   you remember?

1    A    It was in the fall, that's all.

2    Q    And you mentioned he said that he initially told you he

3    raised $50,000.  What did you later find out about that

4    claim?

5    A    That at the time he said it, he hadn't actually raised

6    any of that money.

7    Q    And why did LSG select Mr. Das to be their candidate

8    that they would work with?

9    A    We found him the most compelling.  He had a background

10    as a constitutional lawyer, the way he answered questions,

11    he was extremely thoughtful.

12    Q    What qualities did the defendant promote when he talked

13    about running for office.

14    A    What qualities?

15            Yeah, I remember mostly his -- you know, his

16    background, His father's story, making it here in America,

17    him being an attorney, working in India for several years,

18    being a -- I think it might have been a clerk for a judge,

19    and those sorts of things.

20    Q    Showing you what has already been admitted as Exhibit 6,

21    do you recognize this email chain?

22    A    Yes.

23    Q    Who is this email chain between?

24    A    So this is Beej sending an email to Scott Tully, with

25    Toby and me BCC'd here.

1    Q    Who is Scott Tully?

2    A    He was someone who often would make a contribution to

3    the campaign.

4    Q    A potential donor?

5    A    Yes.

6         MS. WAN:  So if you could go, Ms. Comcowich, to the

7    second page and blow up the paragraph starting with, "I'd

8    love to reconnect with you..."

9         Excuse me.  I'm sorry.  Could you blow up the

10   paragraph after that, "My strengths are, of course..."

11       (Exhibit published to the jury.)

12   Q    Mr. Das [sic], does this accurately describe the types

13   of qualities that Mr. Das promoted when he was fundraising?

14   A    Yes.  Yeah.

15   Q    And is it true that Mr. Das touted that he was a

16   constitutional lawyer by training and clerked for a

17   prestigious judge?

18   A    Yes.

19   Q    Let's talk about your role as -- in the Das campaign.

20   What was your title?

21   A    Finance director.

22   Q    What does the finance director do?

23   A    They're in charge of fundraising.

24   Q    What does that entail?

25   A    Fundraising -- as the finance director, you're putting a

1    system in place.  So you're not making asks of anyone

2    directly, but you are stewarding the candidate in how to

3    make those asks, and you're giving them a system where you

4    can track them through call time.  You can follow-up with

5    donors and make sure that you're asking for the correct

6    amounts and -- as much as possible.

7    Q    How did you provide that system to a candidate?

8    A    Well, I mean, the system itself, you start by just going

9    through the candidate's personal contacts.  So organizing

10   based on how close you are with each group of people.  Often

11   it's your family, followed by your alumni networks, followed

12   by your professional networks.  Then prioritizing who could

13   gift the most money.

14           Then you have to go from there.

15           So now you go back to who you are closest to and in

16   that group who could give the most.

17           And you then start making calls.  We call that

18   "call time."

19           You often sit next to the candidate with the list,

20   and they, as quickly as possible, go though making a hard

21   ask.

22           And when a person does commit to donate, sending a

23   follow-up right away with a "thank you," the urgency, or the

24   hook, whether I should give now or not or in two or three

25   weeks, as well as -- if I didn't already say this,

1    apologies, but the specific amount that that person did

2    commit to.

3    Q   Did you ever -- during any of these call-time sessions,

4    did you ever make any calls to ask for donations for

5    Mr. Das?

6    A   I did not.

7    Q   Why is that?

8    A   Because it just wouldn't be as impactful.  It's like, if

9    you're running for Congress, the idea of me calling, you

10   know, your aunt and asking would actually be

11   counterproductive.  It might actually be insulting for them.

12   It's always most impactful coming from the person that needs

13   to raise the money.

14           MS. WAN:  If we could pull up Exhibit 1, page 3,

15   please, and if you could highlight the section starting

16   "fundraising."

17       (Exhibit published to the jury.)

18   Q   Now, Mr. Chast, does that accurately reflect the type of

19   services you provided to Mr. Das' campaign?

20   A   Yes.

21   Q   And I notice the last bullet point says, "Ensure data

22   integrity in NGP VAN."  What does that mean?

23   A   That means putting everything in NGP.  If there's -- you

24   look at your contacts or bad phone numbers, going out and

25   finding better information.

1    Q    What is NGP VAN?

2    A    It's the democratic database.  So it's what most

3    democratic candidates would use to track their fundraising

4    potential donors and any commitments that haven't come in

5    yet.  Those sorts of things.

6    Q    Does it also track actual donations?

7    A    Yes.

8    Q    And did Mr. Das' campaign use this software, NGP VAN?

9    A    We, at least for a few months, I believe we did, yes.

10   Q    Now, I notice that the statement of work doesn't discuss

11   filings?

12   A    Correct.

13   Q    Did you come to prepare the FEC filings for Mr. Das'

14   campaign?

15   A    I came to prepare them, yeah.

16   Q    And how did that come about?

17   A    Organically.

18         So I was there to fundraise.  And at that point the

19   campaign manager had left.  So there wasn't really anyone

20   else that would have been able to put together the

21   spreadsheets from the database.  And it just made the most

22   sense.  It happened organically.

23   Q    You mentioned the campaign manager had left.  Who was

24   that campaign manager?

25   A    His first name was Luke.

1    Q    And we'll talk more about the FEC contributions in

2    moment.

3              But going back to the contributions, what were the

4    different ways that a person could make a donation?

5    A    Well, they could make a donation online, or write a

6    check, would be the two most common.

7    Q    And online, what system did the Das campaign use to

8    collect online contributions?

9    A    ActBlue.

10   Q    How did -- what, if anything, did you do to monitor the

11   ActBlue contributions?

12   A    So with ActBlue I do a few things.  I could create

13   specialized contribution links.  So if somebody were to

14   commit to raise money for us or if we were to have a

15   specific event, we could create a link that would track the

16   success of anyone's particular efforts, as well as have

17   access through the back end, where I could download the

18   spreadsheet from ActBlue and then upload that back to NPG

19   VAN.

20   Q    To track contributions; is that correct?

21   A    Correct.

22   Q    Now, you also mentioned that contributions could come in

23   as checks.  Could you describe that process?

24   A    Sure.  Absolutely.

25              Checks could either be mailed in, or if someone was

1      at an event, write them there and leave them.  Yeah.

2      Q    Who typically collected the checks?

3      A    That would be Beej?

4      Q    That's Mr. Das?

5      A    Yes.

6      Q    And what did he do with the checks after he collected

7      them?

8      A    He'd put them in the bank.

9      Q    And were you aware of whether the campaign had a bank

10     account?

11     A    Yes, it had a bank account.

12     Q    How did you know that the campaign had a bank account?

13     A    Because Beej said it had a bank account.

14     Q    Did you have any access to the campaign's bank account?

15     A    No.

16     Q    Did you ever ask for access to the campaign's bank

17     account?

18     A    Yes.

19     Q    What do you remember about asking for access?

20     A    I remember asking in person.  I also remember asking

21     over email.

22     Q    And do you have a specific memory about when or where or

23     any details, any specific memory, of how that -- how you

24     asked Mr. Das for access to the bank account?

25     A    I mean, specifically just that it would have been at the

1    campaign headquarters that they had.

2            Beej -- often he said, yes, but if he didn't want

3    to follow through with something --

4            MR. KENDALL:  Objection, your Honor.  What he

5    didn't want is reading my client's mind.

6            THE COURT:  Fair enough.  The jury will disregard

7    the comments.

8    Q   What was Mr. Das' response when you asked him for access

9    to the bank accounts?

10   A   He agreed to give it to me.

11   Q   And what happened next?

12   A   It didn't happen.

13   Q   Why did you ask for access to the campaign's bank

14   accounts?

15   A   It's the best way to make sure I had everything I needed

16   to track the contributions.

17   Q   And if you didn't having access to the bank accounts,

18   what did you do instead to track campaign contributions?

19   A   I would have to get anything that Beej deposited from

20   him directly.

21   Q   And what form did he give you that in?

22   A   It varied.  I do remember his parents' contribution.  He

23   had a -- like -- they call it a "copy" of those checks.  But

24   otherwise it would come on a list.

25   Q   So other than the ActBlue donations, which you could

1    confirm online, could you confirm any of the fundraising

2    amounts and the sources when Mr. Das provided those

3    contribution amounts to you?

4    A    No.

5    Q    And who did you rely on to accurately provide

6    contribution information?

7    A    Beej.

8    Q    Now, Mr. Chast, are you aware that there are federal

9    campaign contribution limits?

10   A    Yes.

11   Q    Do you happen to remember what the contribution limits

12   were for the 2017-to-2018 election cycle?

13   A    I believe they were -- forgive me.

14        I believe it was -- so one person could give 5,800

15   for two campaigns.  So I'm trying to divide that in half,

16   because that's what you could give for the primary and

17   general right now.

18   Q    Let me refresh your recollection.

19        MS. WAN:  If we could have Exhibit 6 at page 2,

20   please.

21        (Exhibit published to the jury.)

22   Q    Again, this is the email with the potential donor that

23   we just discussed.

24        MS. WAN:  If we could now highlight the paragraphs

25   starting with, "I'd love to reconnect..."

1    Q    And Mr. Chast, if you could read for us the sentence --
2    the two sentences beginning, "Our first..."
3    A    "Our first and biggest challenge right now is to get our
4    fundraising engine on and active.  That will require a
5    strong network of people who can write checks of $2,700
6    each."
7    Q    And, Mr. Chast, what's the significance of this figure
8    of $2,700?
9    A    That is the amount that one person can give per
10   campaign.  So they can give that for the primary election
11   and then again for the general election.
12   Q    As Mr. Das' finance director, did you talk to him about
13   campaign contribution limits?
14   A    Yes.
15   Q    In what context?
16   A    That was important, to target the amount that we were
17   going to ask.
18   Q    For potential donors?
19   A    Yeah.  Yeah.  You want to get the most possible, and so
20   knowing how much you're allowed to ask is important.
21   Q    Now, what did Mr. Das say to you about campaign
22   contribution limits?
23   A    What did he say to me?
24   Q    I can rephrase.
25             When you told Mr. Das about the campaign

1      contribution limits, did he indicate that he understood

2      that -- that there were campaign contribution limits?

3      A    Yes.

4      Q    How did he indicate that?

5      A    Well, it's what we use for anything.  So it's here in

6      email asks, and it would be what we'd ask in call time as

7      well.

8      Q    And you were present for those call-time sessions?

9      A    Not always.

10     Q    Were you present for any call-time sessions when Mr. Das

11     asked for the maximum contribution amount?

12     A    Yeah.

13     Q    And showing you Exhibit 11.

14          (Exhibit published to the jury.)

15     Q    Could you please tell the jury what this document is?

16     A    This is an email between Beej and Jay Shah, and it looks

17     like I'm cc'd here as well as one other person.

18     Q    Who did you understand Mr. Shah to be?

19     A    He was the finance chair of the campaign.

20     Q    And what does the finance chair do?

21     A    It could be an honorary position.  So most campaigns can

22     create a finance committee, which is a title you can give to

23     people who you believe could raise you the most money.  So

24     you put someone on the finance committee.  You're hoping

25     they're going to be able to fundraise for you later on.

1    Q   As the fundraising director, did you have significant

2    communications with Mr. Shah?

3    A   I wouldn't describe it as significant.  I tried reaching

4    out.

5    Q   Did you ever meet Mr. Shah?

6    A   I don't recall meeting him.  I -- nothing significant.

7    Q   Who told you that Mr. Shah was the chair of the finance

8    committee?

9    A   Beej did.

10    Q   Could you please read this section starting with "Couple

11    can give..."

12    A   "Couples can give $5,400 for the primary, and a total of

13    $10,800 through the entire election cycle.  To give $10,800,

14    two separate contributions of $5,400 must be made, each

15    under a separate name.  I appreciate you circulating this to

16    your executive team and others."

17    Q   I see that's followed by a link.  Is that one of those

18    ActBlue links you just talked about?

19    A   Yes.

20    Q   Now, what was your initial impression of Mr. Das'

21    fundraising potential?

22    A   Initially, I thought it was very good.

23    Q   Why is that?

24    A   Well, he had been a lawyer both at Hilton, I believe.

25    It was a chain in -- that was also in India.  But then also

1    he had worked for a firm here in Boston, too.  So often

2    attorneys have a great number for fundraising, and that's

3    pretty exciting.

4    Q    What was Mr. Das supposed to do in order to raise money?

5    A    He was supposed to call and makes asks.

6    Q    And what actually happened?

7    A    That our call time got eaten up all the time for a ton

8    of different reasons.  It just didn't really come together.

9    Q    How much did you expect -- as the fundraising director,

10   how much time did you expect Mr. Das to devote to call time

11   in a given week?

12   A    A typical race, at least two hours a day.

13   Q    And did Mr. Das spend that time fundraising?

14   A    No.  I don't believe he spent that much time

15   fundraising.

16   Q    What did he do during that time set aside for call time?

17   A    Well, I was doing staffing call time the most with him,

18   I would say in the spring, and I did it a little bit after

19   Luke left in December.  In those instances, we could start

20   late.  We could end early.  Calls could come in, and they

21   could be something that goes on for 20 minutes.  When really

22   in call time the goal is to stay on the list and keep it to

23   two to three minutes.  We could break for food, break for

24   coffee.  Discovery of like, Oh, there's an event happening

25   in Lowell.  Let's go to that instead.

165

```
1              There were lots of things happening.

2     Q    What, if anything, did you do to address Mr. Das'

3     behavior or his lack of discipline during the call time

4     sessions?

5     A    Well, I wouldn't say there's very much I could do, you

6     know.

7              I do remember one time in particular we talked

8     about having an event in Maine.  And he wanted to call and

9     book it right away.  And I recommended that we get a list of

10    20 names, cull through them, and if enough people said that

11    they could give if you were to do an event in Maine, then we

12    could call, schedule it, and figure out what works best for

13    the most amount of those people.

14             We did put the list together, but we got through

15    maybe four names before he booked the event and the call

16    time was over.

17    Q    And did that fundraiser in Maine actually occur?

18    A    I don't remember if it actually occurred.

19    Q    Did Mr. Das raise -- excuse me.

20             Did Mr. Das participate in other fundraisers?

21    A    Yeah.

22    Q    And can you describe where those fundraisers took place.

23    A    We tried one in New York.  I believe there was one in

24    D.C., and there -- we might have tried to but not actually

25    put together an event out in California as well.
```

1    Q    How profitable were those fundraisers in terms of
2    donations?

3    A    I don't remember them bringing in any donations.

4    Q    Did they incur costs to the campaign to put on?

5    A    I -- presumably.  I don't remember.

6    Q    What did you observe Mr. Das doing on the day to day for
7    the campaign outside of call time?

8    A    Well, outside of call time, I wasn't -- I guess I
9    wouldn't typically be up there.  So I'm not sure how to
10   answer that.  I'm sorry.

11   Q    I can rephrase.

12        In the -- on days when you did see Mr. Das, did you
13   perceive a type of image that he tried to portray on the
14   campaign trail?

15        MR. KENDALL:  Objection, your Honor.

16        THE COURT:  Yeah, I don't quite understand that
17   question.

18        MS. WAN:  I can move on, your Honor.

19        If we can go back to Exhibit 11.

20        No.  Excuse me.  I'm sorry.  Exhibit 8.

21        That was my fault, Ms. Comcowich.

22     (Exhibit published to the jury.)

23   Q    Could you describe to the jury who are the senders and
24   recipients of this email?

25   A    Yes.  This is an email from Beej to Ajoy Bose.  And I am

```
 1    bcc'd on it.

 2    Q    Who is Mr. Bose?

 3    A    Another prospective donor.

 4    Q    And what is this email discussing?

 5    A    I mean -- okay.  I'll take a second to read it.  I'm

 6    sorry.

 7         (Pause in proceedings.)

 8    A    It's sort of reconnecting, offering his bio.  At the

 9    bottom here also it's floating ourself to ask to also make a

10    contribution to the campaign.

11         MS. WAN:  If we could highlight the section

12    starting, "We are heading into the end of the year."

13    Q    The email discusses a 12/31 deadline.  What's the

14    significance of this 12/31 deadline?

15    A    We file a report every quarter.  So the amount of money

16    that was raised by December 31 was going to be the first

17    time all the campaigns are being compared to each other

18    based on the fundraising numbers.

19    Q    Did you discuss the importance of this fundraising

20    deadline with Mr. Das?

21    A    Yeah.

22    Q    What did you tell him?

23    A    Well, that the contributions made at that time, they'd

24    be public; so that the total amount, which is what we were

25    trying to get as high possible, would be what people
```

1   reported.

2   Q    Was there anything about this type of congressional race

3   that would be -- that would make the fundraising total

4   particularly important?

5   A    Yeah.  I mean, at this time I think you're not going to

6   have any sort of polling information out.  So as far as what

7   any reporter would have to report, the only horse race

8   information would be how much money each candidate had

9   raised.

10  Q    Did Mr. Das have a specific fundraising goal for the

11  first quarter that he communicated to you?

12  A    That he communicated to me?  I don't remember.  I do

13  remember us talking about a $300,000 amount, that being what

14  some of the candidates were told they needed to raise to be

15  viable.

16  Q    After being copied on this email -- and, by the way,

17  what's the date of this email?

18  A    That is December 11, 2018.

19  Q    Does this email have any mention of personal loans or

20  Mr. Das' hotel business?

21  A    It does not.

22  Q    Does it have any mention of the defendant's mother,

23  Mitra Das?

24  A    No.

25  Q    And after being copied on this December 11, 2017 email,

1    what steps did you take to encourage Mr. Das to follow-up

2    with Mr. Bose?

3    A    I would have done a number of things.  I would have put

4    it in the contribution tracker, followed-up in person.  I at

5    times did like the calendar invites.  Just -- yeah.

6    Q    And showing you --

7              MS. WAN:  Ms. Comcowich, could you pull up

8    Exhibit 9 and Exhibit 10.

9         (Exhibits published to the jury.)

10   Q    Mr. Chast, what's shown here in previously admitted

11   Exhibits 9 and 10?

12   A    This looks likes a calendar.  I am using it as a

13   reminder.

14   Q    Who are you reminding?

15   A    Beej.

16   Q    What are you reminding him of?

17   A    To follow up with Ajoy.

18   Q    Why is that important?

19   A    We believe Ajoy could give the $10,800 amount between

20   him and his spouse.

21   Q    Showing you Exhibit 12, is this an email from Mr. Bose

22   to Mr. Das copying you?

23   A    Yes.

24   Q    And does this discuss the contribution?

25   A    That's my understanding, yeah.

```
1    Q    Now, do you remember helping Mr. Bose with his
2    contribution?
3    A    I do.
4    Q    What do you remember?
5    A    I connected with Ajoy over the phone and was able to
6    take their information in order to put it through ActBlue
7    myself.
8    Q    Now, you mentioned the 12/31 fundraising deadline.
9              If I could show you Exhibit 13, can you describe
10   for the jury what this document is?
11   A    This is an email from me to Beej and Deb, and it looks
12   like I'm celebrating our success.
13   Q    By the way, who is Deb Belanger?
14   A    She was a campaign staffer that stuck with Beej through
15   a lot of the campaign, yeah.
16   Q    And what's the date on this email?
17   A    12/30/2017.
18   Q    What are you telling Mr. Das and Deb about their
19   fundraising totals?
20   A    I'm reporting the number in NGP and celebrating it as a
21   whirlwind and congratulating them.
22   Q    What was the exact fundraising total to date?
23   A    So the total in NGP, $116,571.
24   Q    What did Mr. Das do in order to -- excuse me.
25              What did Mr. Das do in terms of fundraising in the
```

1    last few days of 2017 to try to meet his year-end

2    fundraising goal?

3    A    He kind of hunkered down by himself.  I'd say he decided

4    he could focus better.

5             MR. KENDALL:  Objection, your Honor.  He's by

6    himself.  I don't know if he knows what he's doing.

7             THE COURT:  Sustained.

8    Q    What did Mr. Das tell you he wanted to do in terms of

9    fundraising for the last few days of 2017?

10   A    He wanted to do it unstaffed, without me.

11   Q    Was that unusual?

12   A    It's unusual.  It's hard to keep the candidates focused

13   when someone is not there.

14   Q    Do you recall how much Mr. Das eventually raised in that

15   first quarter of fundraising?

16   A    Raised -- I don't have the number.

17            MS. WAN:  I can show you Exhibit 2, please.

18        (Exhibit published to the jury.)

19   Q    Do you recall that Mr. Das raised about $425,000?

20   A    Yeah, that being the number combined with the amount he

21   loaned the campaign.

22   Q    Were you involved in preparing this press release?

23   A    I would have sent the numbers to the communications

24   team.

25   Q    And who's the communications team?

1    A    Molly and Scott.

2    Q    Now showing you Exhibit 17, which has been previously

3    admitted.

4         What is this document?

5    A    It's an email from Molly to me, and it looks like --

6    okay.  So it's a thread back and forth starting at the

7    bottom where I'm giving her not only the amount but also

8    some other information that might be helpful to her.

9    Q    Where did you get this information that you're

10   providing?

11   A    This would be -- so it's in January.  So the amount in

12   our database, NGP, that would be anything from ActBlue that

13   I could have downloaded from ActBlue and then uploaded into

14   NGP, plus any contributions that Beej deposited via check.

15   Q    You write: "Total revenue over $425K.  (his loans

16   weren't always round numbers, waiting on the totals.)"

17        What do you mean by that?

18   A    I'm waiting for Beej to tell me exactly what the loans

19   were.

20   Q    And who did you rely on to learn how much Mr. Das had

21   loaned to the campaign?

22   A    I relied on Beej.

23   Q    And where did you get the information about the cash on

24   hand that was reflected in the press release?

25   A    The press release amount, that I believe was also from

```
1    Beej.

2              I'm trying to remember the press release.  It was

3    five-hundred-something thousand dollars.  That number was

4    from Beej.

5    Q   Now, how did the campaign use the information about

6    their fundraising totals when talking to additional donors?

7    A   We used it as a sign of strength for our campaign.

8    Q   And showing you Exhibit 18.  Could you tell the jury

9    generally what this document is.

10   A   This is an email from Beej to Jay Shah cc'g me, and

11   reporting out what we believe to be very good numbers.

12             MS. WAN:  And, Ms. Comcowich, could you blow up the

13   first paragraph.

14   Q   And, Mr. Chast, could you read starting from the, "We

15   hit..."

16   A   "We hit the right numbers -- the press is eating it up.

17   We announced that we raised 425,000 and have 550,000 on

18   hands.  WGBH's David Bernstein tweeted, 'Gotta pay attention

19   to him folks' with respect to my numbers.  Several of the

20   Indian press organizations have also picked up the news.

21   Here is a relevant clip."

22   Q   And, Mr. Chast, who sent this email to Mr. Shah?

23   A   Beej.

24             MS. WAN:  Your Honor, I'm about to enter a new and

25   substantive category of examination.  Would you like me to
```

```
1    continue or --

2              THE COURT:  No.  I think this would be a good point

3    to suspend rather than interrupt the next train of thought.

4        Jurors, I want to thank you for a really good day's

5    work.  I know it's been a long day.  Tomorrow will be

6    shorter.  But please remember breakfast at eight or shortly

7    thereafter will be waiting for you.  And we'll get started

8    right at nine o'clock.  We will stay on time and keep this

9    trial moving as efficiently as it did today.

10       So with thanks to the jurors, we will be adjourned

11   until tomorrow at 9 a.m.

12             THE CLERK:  All rise.

13       (Proceedings adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      I N D E X

2

3       OPENING STATEMENT BY THE GOVERNMENT.

4       Ms Wan:                                    17

5       OPENING STATEMENT BY THE DEFENSE.

6       Mr. Kendall:                               35

7

8    WITNESS:              DIRECT   CROSS   REDIRECT   RECROSS

9    SCOTT FERSON

10   By Mr. Gallagher        64              144

11   By Mr. Kendall                  116              146

12   ERIC CHAST

13   By Ms. Wan             149

14

15                    E X H I B I T S

16   DEFENDANT'S:                        ID.      IN EV.

17   161       LSG "Campaign Management"          131

18   162       12/13/17 email.  Chaudhuri to      136

19             Ferson and Das

20

21

22                      * * * *

23

24

25
```

### C E R T I F I C A T E


I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/s/James P. Gibbons            February 4, 2025
    James P. Gibbons



JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jamesgibbonsrpr@gmail.com